Michael T. WHITE, et al., Plaintiffs,

v.

Terry L. MORRIS, et al., Defendants.

No. C–1–88–470.

United States District Court,
S.D. Ohio, W.D.

Aug. 31, 1993.

Robert Franklin Laufman, Cincinnati, OH, for plaintiff.

Michael T. White, pro se.

Scott A. Conan, pro se.

William E. Martin, pro se.

Sharon Janine Zealey, Ohio Atty. Gen.'s Office, Cincinnati, OH, for defendant.

## ORDER GRANTING MODIFICATION OF CONSENT DECREE

SPIEGEL, District Judge.

This matter is before the Court on our Order Approving Consent Decree (doc. 281), the Defendants' Report of Emergency Procedures and Request for Review (doc. 303), the Plaintiffs' Objections to Defendants' Report of Emergency Procedures (doc. 305), the Defendant Tate's Response to Plaintiffs' Objections to Defendants' Report of Emergency Review (doc. 308), the Plaintiffs' Proposed Findings of Fact and Conclusions of Law (doc. 309), the Plaintiffs' Hearing Exhibits (doc. 310), the Defendants' Proposed Findings of Fact and Conclusion of Law (doc. 314), and the Plaintiffs' Revised Proposed Findings of Fact and Conclusion of Law (doc. 316). An evidentiary hearing was held on this matter on July 15, 1993.

## BACKGROUND

The Plaintiff in this case, Michael White, brought this action *pro se* in 1988, claiming that the Defendants had been intentionally assigning cells to inmates on the basis of race. This policy, the Plaintiff claimed, was in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In April 1991, the Court appointed counsel for Mr. White and, shortly thereafter, certified a class composed of

> [a]ll inmates at the Southern Ohio Correctional Facility now or in the future who have been or will be placed in general population.

Order, Doc. 55. Subsequently, the Court approved a consent decree designed to resolve all pending disputes in this case. In relevant part, the consent decree prohibited cell assignments based upon race, unless the warden or his designee personally found the segregation of an inmate to be necessary for institutional security reasons.

Prior to the Courts approval of the consent the decree, the Defendants had voluntarily instituted a policy of random cell assignments. At the time, it appeared that incidents of violence would not increase due to that policy.

On April 11, 1993, the worst prison riot in Ohio history, and one of the worst in United States history, erupted at the Southern Ohio Correctional Facility ("SOCF"). Nine inmates and one corrections officer were murdered and many others were injured during the eleven day standoff. During negotiations as well as after the riot, prisoners repeatedly cited integrated celling as a factor contributing to the tense atmosphere at SOCF. Among the demands the prisoners made as part of their agreement to end the siege, was that the Consent Decree in this case be reviewed. The siege finally ended on April 21, 1993.

After the riot it became apparent that records containing information vital to the classification of inmates' security level along with other prison property, had been destroyed by the rioters. The records have not yet been reconstructed.

According to Warden Tate, due to the riot, too much racial tension exists at the prison, combined with a lack of necessary inmate security information destroyed along with other records during the riot, to resume, at this time, random cell assignments. Thus, since the riot, the Defendants have been assigning cells on the basis of race. Thus, on May 24, 1993, the Defendants filed their request for modification of the Consent Decree, allowing the implementation of emergency procedures "necessary in order to preserve institutional security as a result of the violent disturbance ..." at SOCF. See Defendants' Report of Emergency Procedure and Request for Review, Doc. 303.

The Plaintiffs contend that under the consent decree the Defendants may only assign cells based on an inmate's race if a written finding is made, approved by the Warden or his designee, that the particular inmate "harbors such racial hostility or animosity that he cannot be placed in an integrated cell without a risk of violence." In this case, the Plaintiffs claim that because the Defendants have not met these requirements, they are in violation of the decree.

The Plaintiffs also claim that the Consent Decree's modification clause, contained in Section V, requires that any *proposed* modification be submitted to the Court and to the Plaintiffs, allowing 20 days for the Plaintiffs to object. The Defendants' failure to follow these procedures, the Plaintiffs maintain, warrants the Court's denial of the Defendants' requested modification. Finally, the Plaintiffs claim that the race based cell assignment policy is unconstitutional and must be stopped immediately. If the Defendants cannot do so by randomly assigning cells at this time, according to the Plaintiffs, they must do so by single celling, even if that requires the implementation of an early release program, or the moving of prisoners to other Ohio correctional institutions—a move the Defendants urge, is not possible due to the security risks involved and the overcrowding in other Ohio correctional facilities.

## STANDARDS OF REVIEW

In considering the Defendants request for a modification of the consent Decree, the Court must apply two standards of review: one respecting the propriety of modifying the consent decree in any way, the other regarding the constitutionality of the current "emergency" policy of segregated cell assignments in the aftermath of the April riot.

### a) Modification of Consent Decrees

■ Although the district court may exercise "flexibility" in deciding whether to modify a consent decree, the party seeking the modification "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk County Jail*, — U.S. —, —, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992); *Heath v. DeCourcy*, 992 F.2d 630, 635 (6th Cir.1993). The Supreme Court elaborated on this standard, observing that, "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous.... Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles ... or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, — U.S. at —, 112 S.Ct. at 760 (citations omitted); *Heath*, 992 F.2d at 635. Furthermore, the Sixth Circuit has held, "[i]n the area of institutional reform, consent decrees are subject to a lesser standard of modification...." *Heath*, 992 F.2d at 634.

■ If the moving party meets its burden, the court should then consider "whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, — U.S. at —, 112 S.Ct. at 760; *Heath*, 992 F.2d at 635. Similarly, the "modification must further the purpose of the consent decree, without upsetting the basic agreement between the parties." *Heath*, 992 F.2d at 634.

■ As the Supreme Court noted, however, once a Court has determined that a modification is warranted, principals of federalism and "simple common sense" require the court to give "significant weight to the views of the local government officials who must implement any modification." *Id.* at 764, 764 n. 14; *Stewart v. Rhodes*, 473 F.Supp. 1185, 1187 (S.D.Ohio 1979), *aff'd*, 785 F.2d 310 (6th

Cir.1986). Thus, the powers of the district court in determining the propriety of a modification, explained the Supreme Court, are broad and flexible. *Rufo,* —— U.S. at ——, 112 S.Ct. at 758, 759 n. 6.

### b) Constitutionality of Segregated Celling

■ Despite the district court's "restrictive, but flexible" discretion in reviewing requests to modify consent decrees, *see Heath v. Decourcy,* 992 F.2d 630, 635 (6th Cir.1993), when that modification involves even temporary, purposeful race based celling, the court must also consider the modification in constitutional terms. Thus, we must adhere to the principle that, as a general matter, racial segregation in prisons is unconstitutional. *Lee v. Washington,* 390 U.S. 333, 333–34, 88 S.Ct. 994, 994, 19 L.Ed.2d 1212 (1968); *Stewart v. Rhodes,* 473 F.Supp. 1185, 1189 (S.D.Ohio 1979), *aff'd,* 785 F.2d 310 (6th Cir. 1986). One crucial exception exists, however, with respect to prison segregation, not generally applicable to the population at large, and that is, segregation in prison is not *necessarily* unconstitutional when the "necessities of security and discipline ..." so require. *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (emphasis added) (citation omitted); *Lee,* 390 U.S. at 334, 88 S.Ct. at 994 (Black, Harlan and Stewart, JJ. concurring); *Rhodes,* 473 F.Supp. at 1189.

Thus, the Supreme Court has held, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Nonetheless, "[r]outine and automatic arguments" by prison officials in support of restrictive policies for discipline and security reasons, will not be tolerated by the court. *Cleavinger v. Saxner,* 474 U.S. 193, 207, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985); *Campbell v. Miller,* 787 F.2d 217, 227 n. 17 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986).

Finally, we must emphasize that it is of paramount concern to this Court, as apparently it was to the Supreme Court in *Lee,* that our recognition of this narrow exception should in no way foster in anyone the mistaken perception that "this Court's firm commitment to the Fourteenth Amendment's Prohibition of racial discrimination ..." is in any way "diluted." *See Lee,* 390 U.S. at 334, 88 S.Ct. at 994 (Black, Harlan and Stewart, JJ. concurring). As the district court in *Stewart* observed, "[t]his exception is a narrow one ... and does nothing more than recognize the general principal that prison officials have discretion in *extreme* situations to take whatever action is necessary to maintain discipline and security within their institutions, even if such action infringes on the constitutional rights of inmates." *Stewart,* 473 F.Supp. at 1189 (emphasis added).

### ANALYSIS

### a) Modification of the Consent Decree

The Defendants in this case seek modification of the consent decree claiming that the destruction of inmate security records combined with high racial tensions at SOCF render it too dangerous to comply with the Consent Decree's random cell assignment policy. The Defendants, therefore, seek modification of the Consent Decree pursuant to Section V, in order to preserve "institutional security." Until, they claim, the security records can be reconstructed, they will be unable to resume race neutral, random celling as mandated by the decree.

The Plaintiffs, on the other hand, claim that the Defendants' modification not only violates the express provisions and requirements of the Decree itself, but also that the modification defeats the decree's very purpose, and, more significantly, is violative of the Constitution. Therefore, according to the Plaintiffs, the Court should deny the Defendants' requested modification.

■ We believe the Defendants have met their burden of establishing that circumstances have changed to such a degree that a *temporary* emergency modification is warranted. *See Rufo,* —— U.S. at ——, 112 S.Ct. at 760; *Heath,* 992 F.2d at 635. At the time the Court approved the Consent Decree, the situation in the Prison, at least

superficially, was much different than it is now. Not only were prison officials in possession of all requisite security records at that time, but prison officials had just implemented a voluntary integration policy with apparent success. It had appeared that such a policy, whether implemented voluntarily or under the Consent Decree, would lead to a non-violent transition from a segregated to a desegregated prison. The parties, like the Court, were optimistic; prison officials were in possession of necessary security information and all had no reason to doubt the prospects of continued success in the prison integration policy.

On April 11, 1993, however, all of that changed. Massive chaos erupted in the prison resulting in the murders of nine inmates and one guard and the destruction of vital security records. Rioters kept law enforcement officials at bay for eleven days before a non-violent end to the siege was negotiated, and prison officials once again regained control of the prison. During and after the riot, prisoners expressed their feelings that the desegregation order was among the factors causing tension in the prison, and in fact, one of the demands made by prisoner negotiators was that the Consent Decree in this case be reviewed.

We believe that it is clear from these facts that significant changed conditions have occurred which have made compliance with the consent decree substantially more onerous, if not completely unworkable *at this time.* Without records necessary to accurately classify prisoners' security status, in the midst of an investigation into the riot by law enforcement agencies, and in the face of high post-riot racial tensions, we conclude that forcing the Defendants to comply with the terms of the Consent Decree could lead to a renewed state of emergency. Forcing the random celling policy at this time would pose security problems and would ignore pragmatic penological concerns. Continued risk to the security of staff and inmates of SOCF would hinder the public interest. Consequently we conclude that some sort of modification of the consent decree is warranted.

Having determined that revision of the decree is warranted, we must now turn to the question of "whether the proposed modification is suitably tailored to the changed circumstance." *Rufo,* —— U.S. at ——, 112 S.Ct. at 760; *Heath,* 992 F.2d at 635. As the Plaintiffs point out, the Defendants have failed to provide the Court with a date on which the current policy of segregated celling will end. Such an indeterminate modification of the Decree would not be suitably tailored to the changed circumstance.

Nonetheless, although the Court is loath to prolong, even for another day, the Defendants' segregated celling policy, we must give, as the Supreme Court instructed, considerable deference to the appropriate prison authorities" in addressing the "complex and intractable" problems facing our corrections system. *See Turner v. Safley,* 482 U.S. 78, 84, 84, 107 S.Ct. 2254, 2259, 2259, 96 L.Ed.2d 64 (1987). Thus, consistent with our "flexible" powers in considering modification requests, we find, that only with a strict, Court-imposed timetable aimed at rapidly abolishing the current celling policy, combined with the long range objective of creating an environment in which the Consent Decree can be fully and successfully enforced, the modification is "suitably tailored to the changed circumstance" and should be approved. We base this decision on our conclusion that to force immediate compliance with the Consent Decree would pose a significant security risk, yet to allow an indefinite continuation of the status quo would run afoul of the Constitution.

With respect to these concerns, we note that Warden Tate has testified that reconstruction of prisoner security files may not commence until approximately September 1, 1993, after completion of the criminal investigation into the riot. This understandably creates great obstacles to the accurate assessment of a given prisoner's security status and level of racial hostility. Thus, the Defendants must be first given a reasonable time to reconstruct the records which were destroyed during the riot. Without the crucial information lost in those records, attempting integration could be dangerous to both staff and prisoners, and thus, random celling cannot proceed according to the consent decree.

Similarly, in light the circumstances of the case at bar, the Defendants' have been unable to comply with crucial provisions of the Consent Decree. Principal among those is paragraph VI.A.3. Under paragraph VI.A.3. of appendix A of the Consent Decree, an inmate may receive a cell assignment based on his race,

> [i]f it is determined that the inmate harbors such racial hostility or animosity that he cannot be placed in an integrated cell without a risk of violence, then he may be placed in a segregated cell. Any such placement must be supported by a written finding that such a risk exists, with supporting reasons. The placement must be approved by *the Warden or his designee.* The findings and recommendations must be placed in the inmate's file.

(Emphasis in original). In this case, since the riots, cell assignments have been given out on the basis of race, without the requisite written finding of racial hostility or animosity. This, according to the Defendants, as discussed above, is the result of the destruction of pertinent inmate records, and the fact that no accurate assessment of the inmates' security status is possible until such records are reconstructed.

Thus, the Defendants must be given a reasonable time, after the records have been reconstructed, to comply with the requirements of paragraph VI.A.3., insofar as they intend to continue to racially segregate any inmates after such reconstruction and evaluation of the records. We note that this situation, although understandable in light of administrative chaos following the riot, is intolerable and cannot continue indefinitely and unsupervised.

Furthermore, we note that the Plaintiffs offered expert testimony establishing that a mere delay in the implementation of the Consent Decree while records are reconstructed would not suffice to ensure the successful integration of the prison through random celling. See Transcript of Excerpts of Proceeding of July 15, 1993, Doc. 312. As we noted at the evidentiary hearing, this Court is very concerned about the lack of sensitivity training of the professional correctional staff at SOCF. Evidence developed at the hearing established that a great percentage of the inmates at SOCF are from urban areas, and a majority of whom are African American. Conversely, ninety per cent of the staff at SOCF is white, from rural areas, with little or no experience in relating to minorities from urban environments.

■ We suggested at the hearing and now will order that a condition of our approval of the modification of this Consent Decree is that an intensive professional sensitivity training program be instituted for the correctional staff at SOCF without delay. Sensitivity training for the staff at SOCF is necessary to instill an awareness of, and respect for, the cultural differences among inmates and staff at SOCF, and crucial to the successful, long term, implementation of the Consent Decree.

Thus, we conclude that the modification the Defendants seek is only satisfactory if the concrete goal of the modification is the returning to the full enforcement of the Consent Decree as it was approved by this Court in our Order filed December 1, 1992. With a time table and clearly defined goals as provided by the Court below, along with the sensitivity training for the staff mandated by the Court, we find the modification satisfactory, as well as unavoidable.

By allowing the Defendants, under the strictly supervised schedule detailed below, time to reconstruct the destroyed records and to comply with all of the provisions of the Consent Decree, the Court gives the appropriate deference to the SOCF officials who must administer the prison and implement the terms of the Consent Decree, while also addressing the vital concerns of not only the Plaintiffs, but also the Court, in seeing the swift termination of the prison's current intolerable racial segregation policy.

The Court must also address the Plaintiffs concern that allowing modification of the consent decree would "utterly destroy[ ] the original purpose [of the consent decree] which was to provide for the desegregation of the double cell." See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Doc. 316 at 13. We disagree.

Under *Heath v. Decourcy,* 992 F.2d 630, 635 (6th Cir.1993), any "modification must further the purpose of the consent decree, without upsetting the basic agreement between the parties." *Id.* at 634. In this case, the consent decree was clearly and indisputably aimed at desegregating the prison. However, it was also of paramount concern that the desegregation of the prison would be done in a manner consistent with legitimate penological concerns. In other words, the purpose of the Consent Decree was to ensure the *safe* integration of SOCF. Indeed, the very provisions of the consent decree directly support this conclusion, as well as the conclusion that the Plaintiffs were in agreement with the Consent Decree's dual purpose. Section V paragraph 7 of the Consent Decree, for example, provides for the modification of the random celling procedures as provided in appendix A "at any time the Warden deems it necessary based on *security needs of the institution.*" (emphasis added).

Likewise, Section V paragraph 8 provides that the "parties recognize that the defendant Warden must exercise broad discretion in the adoption and execution of policies and practices, that in his expert judgment, are necessary to *preserve internal order and institutional security.*" (emphasis added). Similarly, as discussed above, under paragraph VI.A.3., race based celling is permissible under certain circumstance where security so requires. Thus, allowing a temporary modification, in consideration of the post-riot situation at SOCF, suits the security concerns embodied in the Consent Decree.

Furthermore, the Court's providing explicit goals and strict deadlines for the rapid and efficient termination of the current segregation policy, as well as requiring the staff to undergo sensitivity training, clearly furthers the Decree's ultimate goal of eliminating race based segregation in cell assignments at SOCF. Thus, by furthering, rather than frustrating, both of the major considerations of the Consent Decree, we find that the modification does not run afoul of the Sixth Circuit's ruling in *Heath.*

█ Finally, the Plaintiffs claims that the Defendants' failure to comply with the Con-

sent Decree's 20 day notice requirement warrants denial of the modification. Section V paragraph 7 provides that the

> Warden may modify the procedures in Appendix A at any time the Warden deems it necessary based on security needs of the institution. the Warden may modify the procedures in Appendix A by filing a copy with the Court and by mailing a copy Certified U.S. Mail to plaintiff's attorney twenty (20) days before the changes are scheduled to become effective. If no objections are filed with the court within twenty (20) days, the changes will become effective without a hearing. If objections are filed, the Court will promptly conduct a hearing to consider the proposed modifications and the objections thereto.

The Plaintiffs correctly assert that the Defendants have not fully complied with the terms of this section. We conclude, however, that in light of the circumstances, it would be wholly unreasonable to fault the Defendants for their failure to comply with the twenty day filing requirement. In this situation there was absolutely no way for the Defendants to have complied with this requirement, as the current modification sought by the Defendants was the result of the riot. We therefore conclude that the Defendants' failure to comply with the section's 20–day filing requirement is no basis to reject a modification in this case.

Accordingly, we conclude that significant and unforeseen changes in circumstances have occurred which warrant revision of this decree. Furthermore, with the Court's guidelines and timetable, detailed below, we find that the modification is suitably tailored to the changed circumstance, and will not frustrate, but rather, will further the objectives of the Consent Decree.

#### b) Constitutionality of Segregated Celling

The Plaintiff has also claimed that the temporary segregation of prisoners on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment. According to the Plaintiffs, while they acknowledged that random celling may not be possible at this time due to the destruction of

records, other methods of desegregation are available. For example, the Plaintiffs suggest that the Defendants "single cell" inmates until security concerns are resolved, allowing the Defendants to resume random double celling.

The Defendants counter by stating that to achieve single celling at this time would necessarily entail the dispersal of prisoners—who's security classifications prison officials are unsure—into other Ohio facilities or to release such prisoners early. The Defendants cite massive overcrowding problems throughout the Ohio corrections system, as well as the lack of security records, in support of their argument that such proposals are dangerous and unfeasible. Thus, the Defendants argue that the only feasible solution is the continued segregation pending completion of the criminal investigation and reconstruction of the records.

■ In considering questions of prison policy, the district court must be mindful of the fact that a prison regulation alleged to infringe inmates' constitutional rights need only be reasonably related to legitimate penological interests to pass constitutional muster. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Furthermore, the Supreme Court has been clear in outlining the role of the federal courts in dealing with questions of prison policy. In *Turner v. Safley*, the Supreme Court observed that

> courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . . [t]he problems of prisons in America are complex and intractable, [and] . . . [r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . .

additional reason to accord deference to appropriate prison authorities.

482 U.S. at 84–85, 107 S.Ct. at 2259–60 (citations and internal quotations omitted).

■ Thus, the federal courts must judge any prison policy addressing security concerns that impinge on prisoners' constitutional rights, under a reasonableness standard of review. Furthermore, in judging the manner in which prison officials have addressed these security concerns, the court must give deference to the appropriate prison authorities.

By the same token, however, it has been held that "[p]rison walls do not form a barrier separating prison inmates from the protections of the constitution." *Id.* at 84, 107 S.Ct. at 2259. Therefore, " '[w]hen a prison regulation, or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.' " *Id.* (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–406, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974). Thus, although the courts will uphold regulations effecting constitutional rights which are reasonably related to legitimate penological interests, the courts will not be swayed by "[r]outine and automatic arguments" made by corrections officials regarding the necessity for discipline and security. *See Cleavinger v. Saxner*, 474 U.S. 193, 207, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985); *Campbell v. Miller*, 787 F.2d 217, 227 n. 17 (7th Cir.1986).

■ First, we conclude that the stated "discipline and security" concerns in this case are not "routine and automatic" assertions, but rather legitimate ones. As noted before, the implementation of the regulations currently under review follow a violent and lengthy prison uprising, the worst, in fact, in this state's history, and one of the worst in this nation's history. Furthermore, we find that under the specific facts and circumstances in the aftermath of the riot, under the strict guidelines and scheduling of the this Court, the temporary segregation of the inmates pending reconstruction of the security records, and evaluation of the inmates' security status, is reasonably related to legitimate penological interests.

Finally, the Defendants have offered evidence that the single celling proposed by the Plaintiffs as an alternative to current state of affairs would pose numerous serious security and logistical problems stemming from Ohio's overcrowded prison systems, and the destruction of prisoner record. We believe that, as the Supreme Court has noted, "[w]here a state penal system is involved, federal courts have ... additional reason to accord deference to appropriate prison authorities." *Turner*, 482 U.S. at 84–85, 107 S.Ct. at 2259. Thus, as the court in *Stewart v. Rhodes*, 473 F.Supp. 1185 (S.D.Ohio 1979), noted, the "Court must strike the proper balance between the constitutional rights of [the inmates] ... and the clear authority of prison administrators to implement procedures necessary to the maintenance of discipline and security." *Id.* at 1187. Unlike the court in *Rhodes*, however, we conclude that the balance in this case must weigh in favor of the Defendants, provided that they fully comply with all of the requirements and deadlines as set forth in this Order.

Consequently, we conclude that the temporary segregation in this case, in the wake of the riot and in the absence of necessary records destroyed during the siege, in light of the conditions placed upon the prison by this Court, is reasonably related to legitimate penological interest. Accordingly, we find that such a policy is not violative of the constitution.

### ORDER

Consistent with the forgoing analysis, in order for the Defendants to remain in compliance with the requirements of the Constitution, and in an effort to strike a balance between the constitutional rights of the inmates and the clear authority of prison administrators to implement procedures necessary to the maintenance of discipline and security, the Court places the following conditions on the Defendants' modification of the Consent Decree:

1) The Defendants must reconstruct the prison records necessary to determine the security status of all inmates which were destroyed during the riots by no later than October 15, 1993, in order to have the means to comply with the terms of the consent Decree's random celling policy;

2) The Defendants must make the necessary determinations and file the necessary written reports pursuant to section VI.A.3 of Appendix A of the consent Decree by no later than December 1, 1993.

3) The Defendants must fully reestablish the implementation of the Consent Decree's random celling policy by no later than January 1, 1994. Any inmates remaining in intentionally racially segregated cells beyond that date must be so celled in accordance with section VI.A.3 of appendix A of the consent Decree; and

4) The Defendants shall institute an intensive sensitivity training program for its correctional staff at SOCF immediately, and submit to the Court periodic reports on a monthly basis detailing the progress of the sensitivity training of SOCF staff.

### CONCLUSION

In light of our conclusions in this Order, the Court wishes to make the following points crystal clear: this Court is in no way approving of, or putting its imprimatur on, invidious, state-sanctioned, race-based, discrimination. The Court has, with great difficulty and reluctance, reached the above conclusions, in light of the particularized and exigent circumstances of this case, and the applicable law as interpreted by the United States Supreme Court. A conclusion drawn from a reading of this Order to the effect that the Court in any way approves of, or considers at all acceptable, invidious discrimination, which has blemished this nation's otherwise proud history, has utterly missed the meaning, purpose, limitations and necessity of this Order.

Furthermore, although the Court approves a modification of the Consent Decree under these most narrow and temporary of grounds, we underline that the Court fully intends to see the complete implementation of the terms of the consent Decree on schedule. Although we are driven to these conclusions based on a certain degree of deference to the Defendants' expertise and experience in the administration of SOCF, the Court's overriding concern and obligation, is to up-

hold the Constitution, and to enjoin acts of racial segregation by public officials.

As Justice Harlan so eloquently stated almost a century ago in his prophetic dissent in *Plessy v. Ferguson,* "[t]he destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law." 163 U.S. 537, 560, 16 S.Ct. 1138, 1147, 41 L.Ed. 256 (1896) (Harlan, J. dissenting). Thus, lest there be any doubt about it, SOCF will cease its practice of intentional race-based celling, with the exception of those placed in segregated cells pursuant to the provision of section VI.A.3 of Appendix A, in accordance with the schedule provided in this Order.

SO ORDERED.