**Seifuddin M.A. SIMPSON, Plaintiff,**

v.

**Martin HORN, et al., Defendants.**

No. CIV. A. 95–8028.

United States District Court,
E.D. Pennsylvania.

Aug. 28, 1998.

Seifuddin M.A. Simpson, pro se.

Sue Ann Unger, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Seifuddin M.A. Simpson ("plaintiff") brought this § 1983 lawsuit against Pennsylvania Corrections Commissioner Martin Horn and several officials at SCI–Graterford ("SCIG"), alleging that the conditions of confinement at SCIG violate the Eighth Amendment proscription against cruel and unusual punishment, and that the classification system for assigning cellmates violates the Equal Protection clause of the Fourteenth Amendment. All defendants have now moved for summary judgment. For the reasons which follow, summary judgment will be granted in favor of all defendants on plaintiff's Eighth Amendment claims. Summary judgment will be granted

in favor of defendant Horn on the equal protection claim, and otherwise denied without prejudice, because plaintiff has not had the opportunity to take sufficient discovery on this issue to allow for resolution at this stage.

Background

Plaintiff filed his complaint on December 28, 1995, at which time he had been a prisoner in D–Block of SCIG since approximately August 30, 1995.[1] He named as defendants: Martin Horn, Commissioner, Pennsylvania Department of Corrections; Donald Vaughn, Superintendent, SCIG; Joseph Murphy, Unit Manager, SCIG; William Conrad, Unit Manager, SCIG; Lt. Rick Sundermier, SCIG; and Lt. William Mash, SCIG. Plaintiff alleged that his physical and mental health were deteriorating as a result of the overcrowded conditions at SCIG and resulting deficiencies in services, supplies and maintenance. Specifically, plaintiff alleged that D-block inmates are double-celled because of overcrowding; that inmates are not provided with adequate furniture, cleaning supplies, laundry service, ventilation, bedding, clothing, seating, recreational equipment or telephones; that inmates are celled only with inmates of the same race; that D-block is not kept clean, and that several cells do not contain cleanable mattresses. He further alleged that the food is served cold 85% of the time, and the dining hall is not kept clean or free of vermin. He alleged that overcrowding presents a serious threat to security to inmates and guards, and that sick call and commissary procedures need reorganization because of the overcrowding. Plaintiff alleged that these conditions violate rights guaranteed by the Eighth Amendment and "any other relevant amendments or articles of the federal and state constitutions."

By his caption and by the breadth of some of his factual allegations, plaintiff purported to represent the interests not only of himself but of the entire class of D–Block residents; he did not, however, move for class certifica-

---

1. Plaintiff was imprisoned at F–Block and then H–Block of SCIG from July 13, 1995 to August 3, 1995. From August 3 to August 30, 1995, plaintiff was at Delaware County Prison. On August 30, 1995, he was returned to D–Block at SCIG.

He was on D–Block until September 6, 1996, when he was transferred to M–Block (restricted housing) as a misconduct sanction. Since then, plaintiff has been housed on E–Block and then B–Block at SCIG.

tion until over a year after his complaint was filed, at which point his request was denied as untimely and insufficient under Fed. R.Civ.P. 23 and Local Rule 23.1. By order dated December 15, 1997, I denied defendants' motion for judgment on the pleadings and allowed plaintiff's action to proceed as an individual claim for damages and injunctive relief. Discovery was completed by February 13, 1998,[2] and all defendants moved for summary judgment on February 27, 1998.

In support of their motion for summary judgment, defendants offer the transcript of the deposition taken of plaintiff on September 17, 1996; declarations of defendants and other prison personnel; grievance forms, requisition forms, SCIG policy statements and memoranda, medical records and commissary receipts related to plaintiff's claims. Plaintiff offers his declaration, declarations of five fellow inmates at SCIG, and grievances and related correspondence. Plaintiff's "factual summary interpreted in plaintiff's favor" included in his response and opposition to defendants' motion for summary judgment, makes no reference to defendants' or plaintiff's exhibits. Because plaintiff is *pro se*, I shall consider the factual averments in his response as evidence to the extent that they are not contradicted by other sworn testimony of plaintiff. *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991); *Martin v. Merrell Dow Pharmaceuticals*, 851 F.2d 703, 706 (3d Cir.1988)(objectives of summary judgment seriously impaired if district court is not free to disregard conflicting affidavit).[3]

The following facts are presented in the light most favorable to plaintiff, the non-moving party, and are organized under the headings used by the parties, with the evidence related to racial classification of inmates discussed last.[4]

Plaintiff was assigned to cell D–225 on D-block at SCIG on August 30, 1995 and remained there until September 6, 1996. Since that time, Simpson has been housed on E–Block and B–Block. The complaint addressed itself to conditions on D–Block, although plaintiff has attempted to add allegations regarding other housing units in subsequent pleadings.

*Plaintiff's D–Block Cell* Cell D–225, which houses two people, measures 77 square feet and is 10 feet, two inches high. It was designed to house one person. The cell contains one bunk bed with no step ladder to reach the top bunk. The cell also contains a toilet, a sink, two word processors, two radios and a television. On average, plaintiff spends fourteen to sixteen hours per day in his cell; he spends approximately six hours per day in the law library. Plaintiff also leaves his cell to attend classes or religious classes, go to meals, showers or recreation.

*Showers*—During the period at issue in this lawsuit, many of the D–Block showers were shut down for maintenance and renovations. D–Block also had an increased population between September and December 1995 because of E–Block's closure for renovations. At any one time, up to half of the showers on D–Block were closed for maintenance during this period. Plaintiff filed a grievance about

---

**2.** As part of his opposition to the motion for summary judgment, plaintiff renews his request to depose the defendants, previously denied in my June 23, 1997 order, without prejudice to plaintiff to re-raise it after resolution of the motion for judgment on the pleadings. Although testimony of the defendants would be relevant to the "deliberate indifference" or subjective prong of the eighth amendment claim, plaintiff has failed, as discussed below, to present sufficient evidence of the objective prong, i.e., that he has suffered a serious deprivation of a basic human need, so I need not reach the "state of mind" part of the test. *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991)(approving district court's dismissal of eighth amendment claims based on insufficient showing of deprivation, without reaching state of mind issue). I will, however, permit plaintiff to

depose defendants limited to his equal protection claim, as discussed below.

**3.** In *pro se* cases, I generally treat verified pleadings as affidavits. *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir.1985)(treating verified *pro se* complaint as affidavit in opposition to summary judgment).

**4.** The record in this case indicates that many improvements, not only in plaintiff's individual situation, but in overall prison operations, were undertaken by defendants' in response to plaintiff's numerous grievances. Plaintiff's advocacy on behalf of himself and his fellow inmates is well noted, and defendants are to be commended for their responsiveness in addressing plaintiff's concerns.

the limited number of showers in November 1995, and received a response on December 14, 1995 informing him that maintenance was ongoing. Plaintiff testified at his deposition that he was able to take one to two showers daily.

*E–Block Supplies*—Plaintiff asserts that supplies intended for D–Block inmates were improperly diverted to E–Block when it reopened, with the result that plaintiff and other D–Block inmates did not receive necessary supplies such as soap powder and envelopes. Defendant Murphy stated in his declaration that supplies earmarked for E–Block were stored on D–Block during E–Block's renovations and subsequently moved to E-Block when it opened.

*Maintenance Repairs*—While E–Block (a new housing block at SCIG) was under construction, D–Block had an increased population and therefore more maintenance requests. Work orders could take from one day to two weeks to complete. Plaintiff complained that it took three months to fix an overflowing sink in his cell; work orders indicate that several attempts were made to correct the plumbing problem. Similarly, plaintiff complains that it took two to three weeks to fix a light; work orders reflect that the maintenance department made repeated repairs to the light.

*Access to Top Bunk*—Plaintiff testified to problems with having to sleep on the top bunk—that it was difficult for him to get to the top bunk because he has a bad knee, that his cellmate did not allow him to put his feet on the lower bunk to hoist himself up, and that the air circulation and ventilation were of poorer quality in the upper part of the cell. Plaintiff testified to injuries to his back, ankles and wrist resulting from jumping up to the top bunk, although there are no medical records indicating such injury. A doctor denied plaintiff's request for lower bunk status, but plaintiff was subsequently granted lower bunk status in June 1997. Plaintiff testified that he did not want to report the fact that his cellmate would not let him step on the end of the lower bunk, because he did not want to be known as a snitch.

*Second-hand Smoke*—Plaintiff's cellmate from August 1995 through January 1996 was a smoker; plaintiff does not smoke, although plaintiff purchases cigarettes, which are a widely used form of currency at SCIG for obtaining favorable treatment and services from other inmates and some guards. Plaintiff stated that he suffered nosebleeds, sneezing and coughing episodes as a result of exposure to second hand smoke. Plaintiff did not request a transfer to a nonsmoking cell, nor otherwise put defendants on notice that he was suffering any injury from second hand smoke.

*Sick Call*—Plaintiff states that sick call procedures have been altered since the filing of this lawsuit, but that previously he was forced to stand for long periods of time on his bad knee (presumably while waiting to be seen). Plaintiff testified at his deposition that people are usually seen at sick call within a day. Plaintiff also testified that one or two guards took his name off the sick call list on a few occasions, and that defendant Sundermier was aware of this.

*Clothing*—Plaintiff did not receive a coat in October or November 1995, when coats were first distributed to inmates. Defendant Mash distributed coats and blankets to the inmates in the fall of 1995; he had an insufficient number in the first shipment and so tried to determine who already had one. There were either one or two coats already in plaintiff's cell. Plaintiff did not inform defendant Mash that both coats belonged to plaintiff's cellmate, because this might have gotten the cellmate in trouble. Mash gave a coat to plaintiff's cellmate but not to plaintiff. After plaintiff complained, Mash offered him one of the remaining coats, but it was too small. Plaintiff received a coat which fit him by November 7, 1995.

*Cleanliness*—In general, inmates are responsible for keeping the prison clean, and inmates are responsible for keeping their own cells clean. Defendants Conrad, Mash and Sundermier inspect areas for cleanliness before releasing inmates from work detail. Plaintiff is provided with soap powder, disinfectant, a mop, a broom, some rags and a bucket for cleaning. Plaintiff complained about insect infestations and birds in the dining hall; he concedes that the problems

have been largely dealt with by improved extermination and new screens, but states that on at least one occasion, a bird defecated onto his food tray.

*Mattresses*—From August 1995 until January 1996, plaintiff had a cloth mattress, which had been disinfected but which may have had stains on it. In January, 1996, plaintiff received a plastic-covered mattress.

*Food*—Plaintiff complained that hot food was often served cold, presumably the result of long lines and a non-functioning food warmer that has since been repaired. Plaintiff testified that he is now on a special diet, for which he does not need to stand in a long line. Plaintiff states that the food at SCIG is "terrible", and does not compare to the food at SCI–Camp Hill or SCI–Somerset.

*Heating, Fans, Ventilation*—Plaintiff testified at his deposition that the air circulation in his cell was poor, and that the vent in his cell was taped over by his cellmate Miller, but that plaintiff untaped it when Miller left. He also testified that there are significant differences in temperature between the upper and lower bunks due to poor air circulation. Defendants state that there was a delay in turning on the heat in October 1995, and that they were unaware of any complaints by plaintiff regarding ventilation, other than a grievance dated July 31, 1995 concerning the heat and air flow in plaintiff's cell. The maintenance department responded on August 9, 1995, informing plaintiff that the system was designed to bring in outside air; if the outside air was very hot, hot air would be brought in. Plaintiff has requested a fan, which may be purchased only if approved by medical personnel, due to the prisons' security concerns.

*Noise*—Plaintiff stated that the noise level on D–Block is extremely high, and that prison policies requiring inmates to speak in low voices and use earphones are not enforced.

*Telephone Access*—Plaintiff testified at his deposition that he may make a 15—minute phone call every other day if he makes a request, but that he does not make such requests out of fear of certain inmates on D–Block who serve as phone monitors. Plain-

tiff did not make defendants aware of his fears nor identify any inmates.

*Commissary*—Plaintiff stated at his deposition that the commissary procedures have improved since he filed the lawsuit, so that he no longer has to stand in line for long periods of time.

*Access to Unit Manager*—Plaintiff states that because of the unit managers' open door policy for seeing inmates, he has to assert himself to see his unit manager, but that he is able to do so.

*Laundry*—Plaintiff testified to no individual problems with the laundry system, but that he chose to wash much of his laundry by hand. He testified that inmates perform most of the laundry services and that "there is no guarantee" that laundry will be returned.

*Violence*—Plaintiff makes broad statements that overcrowded conditions on D–Block have led to increased violence, but alleges no incidents of violence in which he was involved, nor reports any injury resulting from such violence. Defendants offer evidence that inmate-on-inmate violence has decreased at SCIG since early 1995 to the present. Plaintiff disputes the accuracy of defendants' statistics but offers no evidence to contradict them.

*Racial Discrimination in Cell Assignments*—Plaintiff is African American. During the period at issue in this lawsuit, plaintiff was celled first with inmate Miller, who is also African American, and then with plaintiff's cousin (at plaintiff's request), who is also African American. Plaintiff testified that when he first arrived on the "new side" in July of 1995, he requested to be celled with a white inmate who he knew from Delaware County Prison, and was told by an unnamed guard "you know we don't play that up here anymore". Plaintiff testified that defendant Conrad has a chart in his office which identifies all the cells on D–Block as Black cells, Hispanic cells, or White cells. Defendants state that plaintiff never requested to transfer to a cell with a white cellmate (plaintiff acknowledges that he did not renew his request as his preeminent desire is to be in a single cell), and that the chart in the unit

manager's office is for statistical and identity purposes, that it helps officers who are not familiar with the assigned locations of all inmates, and that it is a security tool to discourage inmates from switching cells for the night. Conrad also declared that the count board is a tool for a unit manager or counselor to help an inmate who is unhappy with his cell assignment because of a racial or ethnic difference. Plaintiff states that the count board cannot be used to keep track of the location of inmates because the cells themselves do not identify the race of occupants.

Defendant Murphy, a unit manager, stated in his declaration that cell assignments are made by him or another unit manager, or a lieutenant if a unit manager is not available. Defendant Conrad is, or was, also a unit manager on D–Block; defendants Mash and Sundermier are, or were, lieutenants on D–Block. Defendant Sundermier stated in his declaration that plaintiff was assigned to a cell before Sundermier worked on D–Block. Defendant Vaughn stated in his declaration that he was not aware of plaintiff's request to be celled with an inmate of a different race, and that after he learned of plaintiff's complaint, he discussed the matter with the unit managers and "learned that the blocks did have some inmates of different races sharing cells, but that the great majority of inmates in the blocks that have less transient inmates tend to choose to cell with inmates of similar race, ethnicity and age. The concept of choice is assumed, since inmates could switch cells, usually by mere joint request." Vaughn gave similar reasons for the chart board as those offered by Conrad.

SCIG has a double celling policy statement with compatibility factors to be considered in making celling assignments. Exhibit D–5, an Administrative Memorandum dated March 29, 1990, with the heading "Inmate Housing—Double Celling", lists "race and ethnic biases of the inmate" as one of the factors to be considered in making involuntary double-celling assignments. Exhibit D–6, a policy statement from the Pennsylvania Department of Corrections on single celling ("Z code") and double celling housing policy, dated December 23, 1996, adds the following proviso to the race and ethnic bias factor: "this factor shall not be interpreted to mean that only inmates of the same race should be celled together—rather its intent is to ensure that inmates who have exhibited documented history of interracial violence or a propensity to engage in such, should not be celled with a person upon whom they would be likely to act out."

Exhibit D–8, a memorandum from SCIG Deputy Superintendent Thomas Chwasciewski titled "Placement of Inmates upon Reception" and dated July 1, 1996, states in part: "Effective immediately, the practice of placing inmates of the same race in the same cell will be modified. Inmates should be mixed racially (i.e., black/white, Hispanic with black/white). This is not to say that inmates who are friends or family of the same race cannot be placed together, it is intended, however, to give you a tool when you receive inmates."

Plaintiff states that he has never seen interracial cell assignments at SCIG. Defendants dispute this statement, and state that there are interracial cellmates at SCIG.

Standard for Summary Judgment

Rule 56(c) states that summary judgment is properly granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant (defendant) bears the burden of demonstrating that the evidence presented is insufficient to support the claims and therefore a reasonable jury would be unable to reach a verdict for the plaintiff. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If this initial burden is met, then the non-moving party (plaintiff) bears the burden of demonstrating that there are disputes of material fact that should proceed to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the plaintiff does not carry this burden, then summary judgment should be granted. All doubts are resolved in favor of the plaintiff. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

Defendants in this case have met their initial burden by submitting affidavits and

exhibits which, if undisputed, would entitle them to judgment in their favor. Plaintiff, who is *pro se,* has responded with affidavits and exhibits. Plaintiff also renews his request to take additional discovery (specifically to depose defendants) and argues that summary judgment should be denied on that basis. *See, e.g., Al–Khazraji v. Saint Francis College,* 784 F.2d 505, 517 (3d Cir.1986)(inappropriate to grant summary judgment on plaintiff's racial discrimination claim when plaintiff was unable to conduct full discovery); *cf., Eastman Kodak v. Image Technical Services,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)(summary judgment improperly granted after truncated discovery). Resolving all doubts in plaintiff's favor, I conclude, for the reasons discussed more fully below, that evidence offered by plaintiff in opposition to defendants' motion for summary judgment as to the eighth amendment claim does not create a genuine issue of material fact sufficient to defeat summary judgment in defendants' favor, as plaintiff has not presented evidence sufficient to allow a trier of fact to conclude that defendants acted with deliberate indifference to deprive plaintiff of any basic human need. *Wilson v. Seiter,* 501 U.S. 294, 305, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). As stated earlier in this memorandum, deposition testimony of defendants would not change my resolution of the eighth amendment claims. With regard to the equal protection claim stemming from the alleged racial segregation of inmates, however, I conclude that the record is insufficiently developed to permit a grant of summary judgment, and I will deny the motion in order to allow plaintiff to conduct discovery limited to this issue.

While defendants' written policy on classification of inmates for double-celling, which takes race into account as one of several compatibility factors, is permissible, and even possibly required, under the reasonableness standard of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), plaintiff has come forward with some evidence on the issue of whether, in practice, defendants' consideration of an inmate's race in celling assignments is narrowly tailored to deal with particularized circumstances, and thus reasonably related to legitimate penological purposes, or is broadly employed with the intent to create racial segregation in cell assignments, in violation of the Equal Protection clause of the Fourteenth Amendment. Because the record is not fully developed, I cannot determine whether the evidence is sufficient to warrant a trial on the issue; therefore, I will permit defendants to renew their motion for summary judgment after additional discovery by plaintiff. Eighth Amendment Claim

■ The Eighth Amendment prohibits prison conditions which inflict cruel and unusual punishment. What constitutes cruel and unusual punishment is an evolving standard. *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Conditions of confinement which, "alone or in combination, deprive inmates of the 'minimal civilized measure of life's necessities' as measured by this contemporary standard must be held to be unconstitutional." *Id.* at 347, 101 S.Ct. 2392. "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise...." *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prisoner bringing an Eighth Amendment conditions of confinement claim must establish "both an objective element—that the deprivation was sufficiently serious—and a subjective element—that a prison official acted with sufficiently culpable state of mind, i.e., deliberate indifference." *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996), (citing *Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271). Deliberate indifference requires a showing that the official knows that the inmate faces a substantial risk of harm, and disregards that risk. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■ Overcrowding in prisons, specifically double-celling of inmates in cells designed to house one inmate, is not per se violative of the Eighth Amendment, but it may be if it results in "deprivations of essential food, medical care or sanitation" or "other condi-

tions intolerable for human confinements." *Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

■ Simpson, like the plaintiffs in *Wilson*, alleged and testified to a long list of deficiencies in the prison's ventilation, sanitation, plumbing, laundry, heating, medical and food services. Some of these conditions are disputed by defendants; many, however, are acknowledged by defendants as the unavoidable, and temporary, result of the overcrowded conditions. Simpson, like the plaintiffs in *Wilson*, must offer evidence 1) that these deficiencies alone or in combination resulted in the deprivation of a basic human need, and 2) that each defendant was aware of the deprivation and was deliberately indifferent to it. The evidence offered fails both parts of the test; it shows neither a deprivation of any basic human need, nor that, if there were a deprivation, defendants acted with deliberate indifference to it. Viewing the evidence in the light most favorable to Simpson, what emerges is a picture of a prison overtaxed by the number of inmates it is housing, with resulting breakdowns in the timely delivery of services and maintenance. None of the evidence, however, is sufficient to allow a trier of fact to conclude that plaintiff was deprived of any basic human needs such as food, clothing, shelter, sanitation, warmth, medical care or exercise.

For example, plaintiff alleged that the showers were inadequate in number for all the inmates of D–Block. Defendants acknowledged that many of the showers were non-functioning during renovations. Yet plaintiff testified that he was able to take one or two showers daily. Similarly, the evidence regarding food, sanitation, repairs, supplies and clothing shows, at most, uncomfortable and frustrating conditions, many of them isolated instances; plaintiff has offered nothing, either alone or in combination, resembling the deprivation of a basic human need sufficient to trigger the protections of the Eighth Amendment.[5] Cf., *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50

L.Ed.2d 251 (1976)(deprivation of medical care); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)(prolonged exposure to unsanitary conditions and overcrowding); *Tillery v. Owens*, 907 F.2d 418 (3d Cir.1990)(affirming district court finding of Eighth Amendment violations at SCI–Pittsburgh based on extensive evidence concerning serious deficiencies in sanitation, medical care, plumbing, as well as violence and insecurity). Plaintiff complains broadly of deteriorating physical and mental health as a result of conditions at SCIG, but offers evidence only of rashes and two small cuts from the edge of the bunk.

■ Plaintiff has presented no evidence, either alone or in combination, of a sufficiently serious deprivation to survive summary judgment. Even if I were to consider that plaintiff has met his burden with regard to the first part of the test, which he clearly has not, plaintiff's evidence would still fail the second part of the test—deliberate indifference, which requires awareness on the part of the defendants of a substantial risk of harm to plaintiff, and a disregard for that risk. *Farmer*. Plaintiff offers no evidence of the involvement of defendant Horn in any of his allegations, except that Horn is in charge, and that he has been seen walking around the prison. Similarly, plaintiff asserts that defendant Vaughn is responsible for everything that happens at SCIG. Respondeat superior is not a basis for liability under § 1983. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Urrutia v. Harrisburg County Police Department*, 91 F.3d 451, 453 (3d Cir.1996).

The only evidence offered by plaintiff at all related to the deliberate indifference of any defendants is his statement that defendant Sundermier knew that two guards had removed plaintiff's name from the sick call list, and plaintiff's inference that Sundermier authorized or condoned such behavior to retaliate against plaintiff for suing him. Even accepting as true that Sundermier was aware of and deliberately indifferent to plaintiff's

---

5. Plaintiff has made repeated requests, in prison grievance procedures and in this lawsuit, for a single cell, citing the almost total lack of privacy in a double cell, especially with regard to his

legal materials. Privacy is an inevitable casualty of incarceration, and is not recognized as a basic human need in this context.

desire to go to sick call, plaintiff does not allege that he was deprived of necessary medical care or that he suffered any injury as a result of having his name removed from the list.

Defendants' uncontroverted evidence is that defendants were either unaware of plaintiff's complaints (that both coats belonged to plaintiff's cellmate, that plaintiff was not permitted to step on the end of the lower bunk to reach the top bunk, that plaintiff wanted to be celled with a non-smoker) or that they attempted to respond to plaintiff's complaints in a timely fashion. *Farmer*, 511 U.S. at 847, 114 S.Ct. 1970 (deliberate indifference requires knowledge of substantial risk of harm, and disregard of risk). Delays in making satisfactory repairs or in receiving requested supplies are either not attributable to defendants or show negligence at most. Equal Protection Claim

■ As a general matter, racial segregation of prisons is unconstitutional. *Lee v. Washington*, 390 U.S. 333, 333–34, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). Prison officials, however, "have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline and good order in prisons and jails." *Id.* Prison officials may take actions which impinge on prisoners' constitutional rights when they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

In *Sockwell v. Phelps*, 20 F.3d 187 (5th Cir.1994), the Fifth Circuit Court of Appeals considered the constitutionality of a racial segregation policy for double cell assignments at a Louisiana state penitentiary. The justification offered by defendants for segregating cells by race was "1) prison guards were unable to visually monitor each two-man cell at all hours of the night; 2) the prisoners placed in Angola were the 'worst of the worst'; 3) two instances occurred in which black and white prisoners housed together became violent; 4) racial supremacy groups existed within the prison ranks; and 5) interracial conflicts may have triggered more generalized racial conflicts." *Sockwell*, 20 F.3d at 191.

The court held that the general policy of racially segregating two-person cells violated the Equal Protection Clause of the Fourteenth Amendment, and that defendants' proffered security and discipline concerns did not meet the "particularized circumstances" test of *Lee*. The court noted that a "vague fear of racial violence is not a significant justification for a broad policy of racial segregation." *Sockwell*, 20 F.3d at 191, relying on *U.S. v. Wyandotte County, Kan.*, 480 F.2d 969, 971 (10th Cir.1973).

In *White v. Morris*, 832 F.Supp. 1129 (S.D.Ohio 1993), prison officials sought to modify a consent decree prohibiting racial segregation in cell assignments after a riot allegedly caused in part by the integration order, during which inmates' records were destroyed. The district court analyzed the prison officials' stated discipline and security concerns under the *Turner v. Safley* reasonableness test, and found the proffered concerns to be not "routine and automatic", but legitimate, under the specific circumstances of the riot and resulting destruction of documents showing inmates' security status.

■ The official policy in place at SCIG for classification of inmates for cell assignment, as laid out in defendants' exhibits D–5 and D–6, clearly meets the reasonableness standard of *Turner v. Safley. Cf., Vazquez v. Carver*, 1987 WL 14847 *19 (E.D.Pa.)(J. Huyett)(finding consideration of race in classification of inmates not cruel and unusual punishment; mentioning that classification system not reviewed under equal protection analysis). It spells out that race is to be considered only in the particularized circumstance where there is a documented history of an inmate's racial violence or propensity for such, and is not to be interpreted to mean that only inmates of the same race should be celled together. Plaintiff, however, has put in issue the question of whether this stated policy is in fact the actual policy used for making cell assignments.

Exhibit D–8, the July 1996 memo referring to a modification of cell assignment policy for new receptions, implies that the earlier practice had been to place inmates by race. Defendant Vaughn denies that this

memorandum shows that a practice of racial segregation existed before the issuance of the memo, but is rather a "poor attempt to respond to my I[sic] suspicion that I shared with the deputy that some staff were too easily assuming that inmates of the same race would prefer housing together in the new reception area, before inmates are classified, and thus before staff learns about many of the compatibility factors to be considered." Vaughn also denies that this memo has any relevance to plaintiff's claim, because it refers to new receptions rather than to D–Block, where plaintiff was housed at the time relevant to this lawsuit.

■■■■ Plaintiff cannot prevail on his equal protection claim by offering evidence that the actual policy has the effect of segregating double-celled inmates by race; he must show that it is the intent of defendants to cause such segregation. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). I conclude that the evidence regarding the "chart board" on D–Block showing "Black" cells, "Hispanic" cells and "White cells", along with Exhibit D–8 (the July 1996 memo) and plaintiff's statement that he was told "we don't play that up here anymore" in response to a request to be housed with a cellmate of a different race, is some evidence of intent; however, by denying plaintiff's motion to take further discovery, I denied him the chance to sufficiently develop the record on this issue. I also cannot determine, on the record before me, whether plaintiff has adequately tied each defendant to the classification system sufficient to support liability. Further development of the record will enable me to conclude whether trial on the equal protection claim is necessary, or whether it can be resolved by a renewed motion for summary judgment.

*Qualified Immunity*

Plaintiff has alleged no facts nor offered any evidence showing defendant Horn's responsibility for the alleged double-celling classification system at SCIG. Exhibit D–6, authored by Deputy Commissioner of Corrections Clymer (not a defendant) could arguably be attributed to Horn, but as found earlier, the policy embodied in D–6 is not unconstitutional. Therefore, defendant Horn will be dismissed as a defendant.

All defendants argue that, even if I conclude that plaintiff has sustained his burden as to some or all of his constitutional claims, summary judgment should still be granted in their favor based on their qualified immunity from suit under the "objectively reasonable" standard of *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Defendants argue that a reasonable official in the position of each defendant could have reasonably believed that his actions were lawful in light of existing law and facts known to them, and that therefore they are entitled to summary judgment.

The only case defendants point to as evidence of the existing state of the law regarding the constitutionality of segregating cells by race is *Jensen v. Clarke,* 94 F.3d 1191 (8th Cir.1996). In *Jensen,* plaintiff inmates brought a suit under § 1983 challenging the prison's random classification system for assigning new inmates to double cells, alleging that the system led to an increased risk of violence, in violation of the Eighth Amendment. The Court of Appeals upheld the district court's findings that the essentially random assignment of inmates to double cells increased the risk of harm to inmates in violation of the Eighth Amendment, and also upheld the grant of injunctive relief. The Court of Appeals also affirmed the district court's grant of qualified immunity to the defendants in that case, stating that the diversity of precedent "precludes a holding that reasonable prison officials would have known that they were violating the plaintiffs' clearly established rights ... by randomly assigning incoming inmates to double cells." *Id.* at 1197 (citations omitted).

The constitutional right asserted by plaintiff, however, is not the right to be free from increased risk of harm resulting from random cell assignment, the right at issue in *Jensen.* The constitutional right asserted by plaintiff is the right to equal protection of the law, specifically the right to be free from racial discrimination. Defendants point to no cases indicating that the prohibition of racial

segregation in prisons is anything other than a "clearly established right", which may be abridged in narrowly tailored and particularized circumstances. Defendants offer no evidence of particularized circumstances justifying a general policy of cell assignments by race; they deny that such a policy or practice exists at SCIG.[6]

I conclude that the prohibition on racial segregation in cell assignments is a clearly established right of which a reasonable prison official would be aware. *Lee v. Washington, supra; Sockwell v. Phelps,* 20 F.3d 187, 191 (5th Cir.1994)(finding the right to be free from general policies of racial segregation in prison housing to be clearly established by *Lee* ). I will therefore deny defendants' motion for summary judgment based on qualified immunity.

**THEREFORE,** this 28th day of August, 1998, upon consideration of Defendants' motion for summary judgment (docket # 66) and plaintiff's response, **IT IS ORDERED THAT** defendants motion for summary judgment on plaintiff's claims arising under the Eighth Amendment is **GRANTED**; defendants' motion for summary judgment on plaintiff's equal protection claim is **GRANTED IN FAVOR OF DEFENDANT HORN,** and otherwise **DENIED,** pending further discovery by plaintiff. Plaintiff's request to depose defendants, other than Horn, is **GRANTED,** such discovery to be limited to the equal protection claim. Defendants shall make themselves available to be deposed by plaintiff, at a time and place to be determined by defendants, such depositions to be completed by October 16, 1998. Any motions for summary judgment must be filed by November 6, 1998.

ANITA B. BRODY, J.

---

**6.** This case, in its current posture, therefore rests on different grounds than those presented in *White v. Morris* and *Sockwell v. Phelps, supra.* In those cases, defendants acknowledged a policy of racial segregation in cell assignments, but argued that they were justified under the circumstances. Resolution of this case, however, requires resolution of the factual question of whether such a policy or practice exists at SCIG.