Garrison S. JOHNSON, Plaintiff–Appellant,

v.

State of CALIFORNIA; James H. Gomez, Director, Department of Corrections; James Rowland, Defendants–Appellees.

No. 01–56436.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 2002.

Filed Feb. 25, 2003.

Tanya Forsheit, Proskauer Rose, LLP, Los Angeles, CA, argued the cause for the plaintiff-appellee; Bert H. Deixler, Lois D. Thompson, Aaron P. Allan, Proskauer Rose, LLP, Los Angeles, CA, filed briefs.

Before HUG, JR., BRUNETTI and O'SCANNLAIN, Circuit Judges.

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether a prison reception center housing policy, which uses race as one factor in assigning a new inmate's initial cell mate for 60 days, violates the Equal Protection Clause.

### I

Garrison Johnson is an African–American prisoner in the California Department of Corrections ("CDC"), serving his sentence for murder, robbery, and assault with a deadly weapon. On June 22, 1987, he was received at the California Institution for Men in Chino, California, and since that time has been transferred to a number of different facilities within the CDC. He has been through the inmate reception centers at Chino, Folsom, Calipatria, and is currently incarcerated at Lancaster. At each facility he was double-celled with another African–American inmate.

According to the staff testimony in the record, when an inmate arrives at a CDC institution either as a transfer from another facility or as a new inmate, he[1] is initially housed in a reception center. At

Sara Turner, Deputy Attorney General, San Francisco, CA, argued the cause for the defendants-appellants and filed a brief; Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Paul D. Gifford, Senior Assistant Attorney General, Allen R. Crown, Supervising Deputy Attorney General, San Francisco, CA, were on the brief.

---

1. The complaint does not raise the question of female housing policies and the only plaintiff is male.

the reception center, the inmate goes through a classification process. The CDC evaluates the inmate's physical, mental, and emotional health. The inmate must also provide vocational and educational goals that he wants to accomplish while incarcerated. Finally, the inmate is given a battery of tests. In making its decision, the CDC reviews the inmate's history in jail and any previous commitments to determine his security needs and classification level. The CDC also looks to see if the inmate has any enemies in the prison, such as people who testified against him in the past or in his criminal case, co-defendants, or inmates with whom he may have had disputes during previous incarcerations.

To determine the double-cell housing placement at the reception center, the CDC looks at several factors including, but not limited to, gender, age, classification score, case concerns, custody concerns, mental and physical health, enemy situations, gang affiliation, background, history, custody designation, and race. Although race is only one of many factors, it is a dominant factor; according to the CDC, the chances of an inmate being assigned a cell mate of another race is "[p]retty close" to zero percent. The CDC considers race when making an initial housing assignment because, in its experience, race is very important to inmates and it plays a significant role in antisocial behavior.

Generally, inmates are listed in four general ethnic categories, black, white, Asian, and other. Within each of these categories, officials at the reception center further divide inmates, for example Japanese and Chinese inmates are generally not housed together, nor are Laotians, Vietnamese, Cambodians, and Filipinos. Also, Hispanics from Northern California and Hispanics from Southern California are not housed together because, in the administrators' experience, they tend to be at odds with one another.

Linda Schulteis, the Associate Warden at California State Prison–Lancaster, testified that if race were not considered in making this initial housing assignment, she is certain that there would be racially based conflict in the cells and in the yard. She stated, "I am therefore not willing to knowingly disregard the factors and place an inmate into jeopardy and would not compromise an inmate [sic] or group of inmates [sic] safety by taking steps that I know would result in violence and conflict." This view is unanimously seconded by other prison officials.

Although the rest of the prison is fully integrated—there is no distinction based on race as to jobs, meals, yard and recreation time, and vocational and educational assignments—according to the administrators, the confined nature of the cells makes them different from the other areas of the prison. Staff cannot see into the cells without going up to them, and inmates are capable of placing coverings over the windows so that staff cannot see in them at all. Moreover, inmates are confined to their cells for much of their day. Because of the current levels of racial violence occurring in areas where the staff can easily observe the inmates, the administrators are concerned that they would not be able to protect inmates who are confined in their cells. Thus, the administrators argue that they need 60 days to analyze each inmate on an individual basis to determine whether the inmate poses a danger to others.

After 60 days, the inmate either is assigned a cell within the current institution where he will be permanently housed or is transferred to another institution where his classification indicates that he would be more suited. If the inmate is transferred, he again goes through the initial housing

screening process. If the inmate stays at the institution and has the appropriate security classification, he may be transferred to a dormitory or a single cell.

Inmates assigned to a dormitory are considered nonviolent, and, thus, inmates of all races are housed together. The CDC does not use race as a factor to determine who is assigned to a dormitory, but within each dormitory it attempts to maintain a racial balance so as to reduce the likelihood of racial violence. Single-cell housing decisions are made completely independent from race. Johnson does not allege that either of these two housing policies violate equal protection.

If the inmate remains in a double cell, the CDC's goal is for inmates to select their own cell mate, so as to maximize the inmates' compatibility and to reduce the possibility of violence. There are designated forms that both inmates must sign indicating that they would like to share a cell together. Unless there are security reasons for not granting an inmate's request to share a cell with another inmate, the CDC will usually grant these requests. Race is not a consideration in such decisions.

## II

On February 24, 1995, Johnson as a pro se plaintiff filed his original complaint, alleging that the CDC's reception center housing policy violated his constitutional rights by assigning inmates' cell mates on the basis of race. In January 1998, the district court dismissed Johnson's Third Amended Complaint without leave and Johnson appealed. We reversed the district court's dismissal in part on March 21, 2000 and remanded, holding that Johnson's allegations were "sufficient to state a claim for racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *Johnson v. California,* 207 F.3d 650, 655 (9th Cir.2000).

On remand, Johnson was appointed counsel and granted leave to amend his complaint. He filed his Fourth Amended Complaint on July 5, 2000, seeking monetary damages. He alleged that James Gomez and James Rowland, former CDC Directors, in their individual capacities violated his constitutional rights by formulating and implementing the CDC housing policy. He also sought injunctive relief against Stephen Cambra, the current CDC director. Discovery was conducted, and both parties moved for summary judgment on the equal protection claims. Both were denied. The district court denied the administrators' summary judgment motion because the court concluded that there was a question of material fact regarding what happens to double-celled inmates following the 60 days in the initial reception center.[2]

The district court also denied the administrators' qualified immunity-based motion for summary judgment. After the Supreme Court issued its decision in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), however, Rowland and Gomez successfully moved for reconsideration of the denial of summary judgment. This time, the district court granted the motion, holding that under *Saucier* the former administrators were entitled to qualified immunity because their actions were not clearly unconstitutional. Johnson now appeals from the district court's

---

2. The parties to this appeal, however, no longer contend that the aftermath of the 60–day policy is relevant; Johnson's counsel at oral argument explicitly disavowed any challenge to the continuing effects of the CDC's housing policy and limited the challenge only to the 60–day policy itself. Thus, the only question before this court is whether the CDC's use of race to make the temporary 60–day housing decision violates the Equal Protection Clause.

grant of summary judgment for the administrators.

## III

■ The Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), instructed that before we can determine whether state officials are entitled to qualified immunity, we must first address the merits of the alleged constitutional violation. The first question we must ask is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [officials'] conduct violated a constitutional right?" 533 U.S. at 201, 121 S.Ct. 2151. If we answer this question in the negative, then the inquiry is over and the case should be dismissed: we never reach the issue of qualified immunity. It is only when "a violation could be made out on a favorable view of the parties' submissions" that a court evaluating a claim of qualified immunity should proceed to "the next, sequential step [of] ask[ing] whether the right was clearly established." *Id.* Thus, in accordance with *Saucier*, we first turn to the merits of the case.[3]

## A

■ Johnson alleges that the state's use of race in making initial housing assignments constitutes an impermissible racial classification afoul of the Equal Protection Clause.[4] The Equal Protection Clause provides that "[n]o State shall ...

deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The central mandate of this Clause "is racial neutrality in governmental decisionmaking." *Miller v. Johnson*, 515 U.S. 900, 904, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *see also Shaw v. Hunt*, 517 U.S. 899, 907, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("Racial classifications are antithetical to the Fourteenth Amendment, whose central purpose was to eliminate racial discrimination emanating from official sources in the States." (citation and internal quotations omitted)). Ultimately the Equal Protection Clause strives "to do away with all governmentally imposed discrimination based on race," *Palmore v. Sidoti*, 466 U.S. 429, 432, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (citation and footnote omitted), because "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

The goal of eradicating invidious race discrimination is no less laudable in the prison context. In *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), the Supreme Court tackled the issue of racial segregation in prisons. In a per curiam opinion, the Court held that an Alabama state statute requiring segregated cell blocks in jails and prisons violated the Equal Protection Clause of the Fourteenth Amendment. 390 U.S. at 333, 88

---

3. Although a question of material fact did exist when the district court considered the case, precluding summary judgment on the merits, Johnson conceded that he is not challenging this question of fact anymore. As such, we must first address the merits of Johnson's claim. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

4. The state admits considering race when it assigns inmates their cell mate. Thus, the

policy is suspect on its face, and Johnson need not prove a discriminatory intent or impact. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289 n. 27, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *see also Hunter v. Erickson*, 393 U.S. 385, 389, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Loving v. Virginia*, 388 U.S. 1, 8–9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

S.Ct. 994. *Lee,* however, also recognized that prisons present an inherently different situation than society at large. A three justice concurrence explicitly noted what the per curiam opinion implicitly recognized, that "prison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails." *Id.* at 334, 88 S.Ct. 994. The *Lee* majority has since been interpreted as holding racial discrimination within prisons unconstitutional, save for "the necessities of prison security and discipline." *See, e.g., Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Thus, while recognizing the important need to combat racial discrimination, even in prisons, the Court also recognized that the very nature of prisons may require the use of race-based criteria in official decisionmaking under limited circumstances.

Johnson does not dispute that *Lee* acknowledges that under some circumstances race may be considered in prison decisionmaking, but denies that this is one such instance. The "particularized circum-

stances" or "necessities of prison security and discipline" under which racial discrimination is permissible have never been defined by the Supreme Court or this court, and the meaning of these terms is not axiomatic. To make his argument, Johnson cites cases from our sister circuits that have addressed this issue and have held that an unsubstantiated fear of racial violence or a desire to protect individuals against racial insensitivity does not provide the authority to segregate inmates on the basis of their race into separate tanks or cell blocks, *see, e.g., United States v. Wyandotte County,* 480 F.2d 969, 971 (10th Cir.1973) (holding assignment of inmates to East or West tanks by race unconstitutional); *McClelland v. Sigler,* 456 F.2d 1266 (8th Cir.1972) (holding segregated prison wing unconstitutional), or to 2507 assign inmates permanent cell mates solely on the basis of race, *see, e.g., Sockwell v. Phelps,* 20 F.3d 187 (5th Cir.1994). These cases, however, while helpful to understand what is clearly unconstitutional, do little to define the contours of "particularized circumstances" or "necessities of prison security and discipline" in the case at hand.[5]

---

**5.** Unlike Lee, *Wyandotte County,* and *McClelland,* where the prison officials segregated the prison into black and white cell blocks or tanks under the guise of promoting racial harmony, the CDC is integrated in full. Inmates of all races work together, eat together, and use the yard together. This case simply does not involve a similarly broad segregation policy. Moreover, unlike the permanent policies in place in all of the aforementioned cases, this is a temporary arrangement, lasting only 60 days, which, according to the CDC, permits it to learn more about the inmates before assigning them to a cell on a more permanent basis. The Tenth Circuit recognized this distinction in *Wyandotte County.* In deciphering the meaning of "particularized circumstances," the Tenth Circuit stated that Lee did "no more than recogniz[e] the commonly accepted principle that in the administration of prison affairs there may arise unusual situations in which security and

discipline demand segregation for limited periods." *Wyandotte County,* 480 F.2d at 971 (footnote omitted). In this case, to run a safe prison system, the CDC contends that it must assign cell mates, partly based on the inmates' race, for 60 days so that it can find out more about the inmate and reduce violence within the prison system. The policy is limited to the dangers it seeks to alleviate.

Paramount, in this case, there is also no indication that the use of race in the CDC's decisionmaking disparately affects the inmates. In *Sockwell,* "white cells" received preferential treatment to "black cells"— "white two-man cells were called to showers and to sell plasma first, enjoyed better telephone and store privileges, and had a better view of the televisions," 20 F.3d at 190—and black inmates were deprived of privileges, such as work and plasma donation, while waiting for another black two-man cell to

Given the invidious and pervasive nature of the segregation at issue in *Lee, Wyandotte County, McClelland,* and *Sockwell,* the standard of the court's review probably did not matter; in a close case such as the one at hand, however, the standard of review is paramount. In 1987, in recognition of the unique circumstances that prisons present, the Supreme Court promulgated a new deferential test for examining the constitutional rights of prisoners, *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), a test that had not been applied in any of the cases Johnson relies upon.

### B

■ In *Turner,* the Court held that although prisoners do not check their constitutional rights at the prison gates, *see Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country."), a relaxed standard is used in determining the constitutionality of all prison regulations.[6] *See, e.g., Shaw v. Murphy,* 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) ("[I]n *Turner* we adopted a *unitary,* deferential standard for reviewing prisoners' constitutional claims ...." (emphasis added)); *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) ("We made quite clear that the standard of review we

adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights."); *Morrison v. Garraghty,* 239 F.3d 648, 654–55 (4th Cir.2001) (holding more deferential standard of *Turner* applies to equal protection claims within prisons). *Turner* recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," and that "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." 482 U.S. at 84, 107 S.Ct. 2254 (citation and internal quotations omitted). According to the Court, "[s]ubjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* at 89, 107 S.Ct. 2254. Thus, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254.

■ *Turner* was not merely a cosmetic change in the Court's language. *Turner* ostensibly expanded the definition of "particularized circumstances" and "necessary for security and discipline," and lowered the prison administrators' burden to justi-

---

have an opening, *id.; see also McClelland,* 456 F.2d at 1267 (white cell blocks had better living conditions than black cell blocks). Similar disparate treatment is not present in this case: there are no allegations that African–American inmates receive unfavorable cell locations or disparate treatment as compared to their white or Hispanic counterparts. This is not a situation where prison administrators are rewarding inmates for their "intransigent racial attitudes." *McClelland,* 456 F.2d at 1267.

6. Although we refused to apply *Turner* in the Eighth Amendment context, we held that *Turner* is appropriate "where the constitutional right is one which is enjoyed by all persons, but the exercise of which may necessarily be limited due to the unique circumstances of imprisonment." *Jordan v. Gardner,* 986 F.2d 1521, 1530 (9th Cir.1993) (en banc). Equal protection concerns come within *Turner. See id.* (citing *Griffin v. Coughlin,* 743 F.Supp. 1006, 1010–19 (N.D.N.Y.1990) (applying *Turner* to equal protection claim but not to Eighth Amendment claim)).

fy race-based policies. Under *Turner,* rather than the administrators bearing the burden of proving their housing policy constitutional, the inmate bears this "heavy burden": "To prevail, [Johnson] must overcome the presumption that the prison officials acted within their 'broad discretion.'" *Shaw,* 532 U.S. at 232, 121 S.Ct. 1475. Thus, to the extent, if any, that *Turner's* "reasonably related" standard and *Lee's* "particularized circumstances" inquiry point to divergent paths, we are bound to follow *Turner.* With *Turner* as our guide, we now consider whether the administrators' temporary housing policy is reasonably related to their concern for increased racial violence.

## IV

■ In *Turner,* the Court provided four factors to examine in determining whether the prison administrators' actions are reasonably related to a legitimate penological interest. First, a " 'valid, rational connection' [must exist] between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254 (quoting *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Second, we must determine "alternative means of exercising the right that remain open to prison inmates." *Id.* Third, we must assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Fourth, we must determine whether "ready alternatives" to the CDC's policy are available. *Id.* The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.*

## A

■ The first factor we must consider is whether there is a "valid, rational connection" between the policy and a legitimate government interest. "This requires us to determine whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" *Mauro v. Arpaio,* 188 F.3d 1054, 1059 (9th Cir.1999) (en banc) (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

The prison administrators assert that their race-based housing policy protects the safety of inmates and staff pursuant to the first *Turner* factor. This is undoubtedly a legitimate penological interest. *Mauro,* 188 F.3d at 1059 ("[T]here is no doubt that protecting the safety of guards in general is a legitimate interest.").

The government objective must also be neutral. In this context, neutrality means that the government objective must be unrelated to racial discrimination. *Cf. id.* at 1059. Although the CDC uses race to make its temporary housing assignments, the housing policy does not provide any advantage or disadvantage to any particular race,[7] and the objective, reducing violence among the inmates and against the staff, has nothing to do with race, but rather with inmate and staff safety. Because the prison administrators use race as a factor in making their initial housing assignments, "solely on the basis of [its] potential implications for prison security," the policy is considered neutral in the manner that *Turner* used that term.

---

**7.** If, for example, whites were treated more favorably in cell locations or privileges than blacks as they were in *Sockwell,* 20 F.3d at 190, the policy could not be sustained as neutral and the policy would likely be struck down under *Turner.* *See Morrison,* 239 F.3d at 656 ("The perniciousness of a race-based classification is not lessened simply because we afford more leeway to prison officials in the operation of their facilities....").

*Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) ("Where ... prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, [as opposed to reasons related to the 'suppression of expression,'] the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*."); *Mauro,* 188 F.3d at 1059.

■ Finally, we must determine whether a prison regulation is rationally related to the state's interest. According to Johnson, before the state's use of race as a factor in its decisionmaking can so qualify, *Lee* requires that it must first have an instance, specific to cell assignments, to which it can point to prove the necessity of such a policy. For example in *White v. Morris,* 832 F.Supp. 1129, 1130 (S.D.Ohio 1993), the court allowed double cells segregated strictly along racial lines only after ten people, nine inmates and one corrections officer, were murdered during an eleven-day racial riot, and the integrated double-celling was cited as a primary factor in the riot. 832 F.Supp. at 1130.

Under Johnson's view, the same violence would have to occur within the CDC in order to permit race to be considered as a factor in making initial housing decisions. We disagree.[8] While the administrators simply cannot make "[r]outine and automatic arguments" that protecting the "constitutional rights of prisoners will lead to a breakdown in institutional discipline and security,"[9] *Cleavinger v. Saxner,* 474 U.S.

---

**8.** Although we decline to decide if indeed Johnson is correct that *Lee* would have required actual violence arising out of double-celling specifically, Johnson's argument cannot withstand our consistent application of *Turner*. *See, e.g., Casey v. Lewis,* 4 F.3d 1516 (9th Cir.1993).

**9.** In this case, the administrators' reasoning is not an automatic response. The high level of racial violence in the CDC is well documented, and the administrators are well within their discretion to attempt to rectify or to reduce further violence by taking reasonable measures.

As one example, B. O'Neil, Associate Warden of Pelican Bay, a California State prison, described the numerous instances of racial violence that have caused Pelican Bay to be on lockdown for most of the last couple of years. The current problems started on June 1, 1998, when a riot broke out involving 39 Northern and Southern Hispanic inmates. The Hispanic population was put on lockdown in Facility A and although attempts were made to lift the lockdown, the Southern population continued to be locked down for over 14 months. In August 1999, a controlled release of Southern Hispanics resulted in a number of incidents with Northern Hispanics. The numerical superiority of Southern Hispanics and the likelihood of future violence between the two groups caused the prison administrators to move all Northern Hispanics to other institutions. 90 inmates were involved in a riot between the Fresno Bulldogs and the Southern Hispanics on March 12, 1999.

On March 15, 1999, "White Supremacists" and "Skinheads" attacked whites that were not affiliated with a gang and Northern Hispanic inmates. In total, 31 inmates were involved in this fight. Three days later, a riot involving 39 inmates occurred when Northern Hispanics attacked white inmates. The inmates were placed on lockdown until April 14, 1999. On August 31, 1999, another riot occurred in which over 100 black inmates attacked a smaller number of white inmates. Nine days later, a racial disturbance involving seven black inmates and four white inmates occurred on the yard. On September 27, 1999, another riot occurred involving 30 black inmates and three white inmates.

A major racial riot, involving 250–300 inmates, broke out on February 23, 2000 when Southern Hispanics, joined by some of the white inmates, attacked the black inmates. Prison administrators were required to use lethal and non-lethal force to quell the riot. Sixteen inmates were shot, one fatally, and in all, 25 inmates were taken to outside hospitals. Again, the prison was placed on lockdown. On March 24, 2000, Facility A began to allow segregated releases, but Facility B remained on lockdown. In light of informa-

193, 207, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), *Turner* clearly does not require such a high threshold before a state can act. *See Abbott,* 490 U.S. at 417, 109 S.Ct. 1874 ("We agree that it is rational for the Bureau to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time."); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ("[*Turner*] ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration . . . .'" (quoting *Turner,* 482 U.S. at 89, 107 S.Ct. 2254)); *Harper v. Wallingford,* 877 F.2d 728, 733 (9th Cir.1989) ("In the instant case, the defendants provided the penal institution superintendent's affidavit stating that the materials in question could lead to violence committed both by and against its readers. This constitutes a threat to prison security."); *see also Gates v. Rowland,* 39 F.3d 1439, 1447–48 (9th Cir.1994). For example, in *Casey v. Lewis,* 4 F.3d 1516 (9th Cir.1993), we held that under *Turner* anticipated security problems were sufficient to sustain regulations that were reasonably related to the problem, even though the state did not cite a specific instance justifying its policy: "The [Arizona Department of Corrections's] failure to specify a past event wherein a contact visit resulted in assault, escape, or hostage-taking, does not render irrational the adoption and implementation of a non-contact policy." *Casey,* 4 F.3d at 1521. The CDC simply does not have to wait until inmates or guards are murdered specifically because race is not considered in assigning an inmate's initial cell mate; instead, *Turner* allows the administrators to stave off potentially dangerous policies without first "seeing what happens."

Under our precedent, if there is a common-sense connection between a legitimate objective and prison regulation, the inmate bears the burden of production.[10] *Frost v. Symington,* 197 F.3d 348, 357 (9th Cir.1999). If the inmate fails to proffer sufficient evidence to refute a common-sense connection between the govern-

tion that further assaults were going to take place, prison officials again locked down the prison and searched the complex. The search revealed 78 deadly weapons and 142 items of "dangerous contraband." Because of the continuing danger of racial conflict, the prison remained on lockdown. As of April 20, 2001, the prison officials had thus far failed to remove the lockdown without causing further violence. Declaration of B. O'Neil, Associate Warden of Pelican Bay, at 1–4 (Apr. 20, 2001).

Numerous other incidents involving racial violence in the prison system have been reported in the media. *See, e.g., Sue Fox, Lancaster Prison Locked Down after Riot Hurts 10,* L.A. Times, Aug. 9, 2000, *available at* 2000 WL 2267920; *Racial Fight Erupts at Prison,* San Diego Union Trib., Mar. 3, 2000, *available at* 2000 WL 13951973; Ben Goad, *Race Riot Hits Adelanto Prison: More than 100 men are moved out of the private facility,* Press Enterprise (Riverside, Ca.), Mar. 3, 2000, *available*

at 2000 WL 7016883; Jeff Barnard, *Racial Fights an Inescapable Fact of Prison Life,* San Diego Union–Trib., Feb. 26, 2000, *available at* 2000 WL 13950567; Steve Gessinger, *Violence Mounts as Racial Gangs War in Prisons,* L.A. Sentinel, Mar. 25, 1998, *available at* 1998 WL 11413300; Newsday, *Riot in Calif. Prison, 1 Dead,* L.A. Times, Sept. 28, 1996, *available at* 1996 WL 2538090; Newsday, *80 inmates Hurt in Calif. Jail Brawl,* Jan. 11, 1994, *available at* 1994 WL 7431676.

In short, this is hardly a case where the prison administrators are acting on an unsubstantiated record.

10. Johnson cites a couple of cases from federal district courts where the defendants were required to prove the constitutionality of their policies. *See, e.g., Blevins v. Brew,* 593 F.Supp. 245, 248 (W.D.Wis.1984); *Stewart v. Rhodes,* 473 F.Supp. 1185, 1190 (S.D.Ohio 1979). Post-*Turner,* this is no longer the appropriate analysis.

ment's objective and the prison regulation, assuming that "the governmental objective is legitimate and neutral, *Turner*'s first prong is satisfied." *Id.* (internal citation omitted). On the other hand, if an inmate presents "sufficient (pre or post) trial evidence that refutes a common-sense connection between a legitimate objective and a prison regulation," *id.*, then the administrators bear the burden of proving that the "connection is not so 'remote as to render the policy arbitrary or irrational,'" *id.* (quoting *Mauro v. Arpaio,* 188 F.3d 1054, 1060 (9th Cir.1999)).

Given the admittedly high racial tensions and violence already existing within the CDC, there is clearly a common-sense connection between the use of race as the predominant factor in assigning cell mates for 60 days until it is clear how the inmate will adjust to his new environment and reducing racial violence and maintaining a safer environment. *See White v. Morris,* 832 F.Supp. 1129, 1130 (S.D.Ohio 1993) (noting that race-blind double-celling increased racial tensions in the Ohio prison system). *But see Stewart v. Rhodes,* 473 F.Supp. 1185, 1188 (S.D.Ohio 1979) (pre-*Turner* case holding that prison administrators could not rely upon " 'common sense' attitude toward overall relations between the races in the face of expert testimony supporting an equally 'common sense' attitude" that "segregation ... tends to create racial misunderstandings and tensions"). Indeed, in a previous case before us, a prisoner, alleging an Eighth Amendment violation because administrators failed to consider race when releasing inmates into the yards, argued that "individual prison cells are segregated because

it is widely understood that members of different races would attempt to kill each other solely on the basis of gang membership or race." *Robinson v. Prunty,* 249 F.3d 862, 862 (9th Cir.2001). Thus, the burden to refute this connection lies on Johnson.

Johnson does not disagree that racial violence is pervasive in the CDC,[11] but instead argues that the high levels of racial violence are evidence that the CDC's housing policy does not work. Johnson proffered deposition testimony from prison officials stating that the housing policy has been in place for over 20 years and that racial violence continues to permeate the CDC. Johnson also argues that some gangs are not formed strictly along racial lines, and thus the administrators' use of race is irrational as it is connected to reducing gang violence. This, according to Johnson, is sufficient evidence to rebut the common-sense connection that using race as a factor in determining initial housing assignments reduces racial tension and violence.

Johnson, however, misconstrues the administrators' argument and his burden on this point. The administrators do not contend that their housing policy is a magical elixir designed to cure all the racial and gang tensions within the prison; they contend only that without their policy, racial violence, both within the cells and in the recreation areas, would increase. Johnson has failed to offer any evidence to refute this connection. Just because racial violence already exists does not mean that pre-existing policies do not work to reduce that violence from being even more perva-

**11.** Referring to a racial riot at Calipatria State Prison, a prison from which he had recently been transferred, Johnson stated, "If I would have stayed there, I would have been involved in that because you have four facilities there and each facility went on a major riot and a lot of people got hurt and injured just based upon your [*sic*] skin color. I'm Black, and if I was there I would have been hurt." Deposition of Garrison Johnson, at 35 (Oct. 4, 2000).

sive than it already is. Similarly the fact that some gangs are not based along racial lines does not rebut the connection between gangs and racial violence in prisons,[12] which even Johnson concedes is a problem.

██ Because Johnson failed to refute the common-sense connection between the policy and prison violence, the "government was not required to make any evidentiary showing concerning the connection." *Frost,* 197 F.3d at 357. Instead, we must presume the governmental objective is legitimate. *See id.* We do not have to agree that the policy actually advances the CDC's legitimate interest, but only "whether the defendants might reasonably have thought that the policy would advance its interests." *Id.* at 355 (quoting *Mauro v. Arpaio,* 188 F.3d 1054, 1060 (9th Cir.1999)). In short, "as long as it is plausible that prison officials believed the policy would further a legitimate objective, the governmental defendant should prevail on *Turner*'s first prong." *Id.; see also Casey,* 4 F.3d at 1521 (holding rational connection was established when the anticipated security concern was not "unreasonable"). Here, it is plausible, given the racial violence and tensions already present in the CDC and the knowledge that in other prison settings race-blind housing assignments have caused violence, that the administrators believe using race as one factor in making an initial housing determination is necessary for inmate and staff safety. Therefore, *Turner*'s first prong has been met.

### B

The second factor we must consider under *Turner* is whether alternative means of exercising the right remain open to prison inmates. "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Mauro,* 188 F.3d at 1061 (ellipsis in original) (quoting *Turner,* 482 U.S. at 90, 107 S.Ct. 2254 (citations and internal quotation omitted)). Here, Johnson asserts the right to be free from race conscious decisionmaking while an inmate at the CDC.

In examining whether alternative means for Johnson to exercise his right exist, we must examine Johnson's right expansively and sensibly, *Abbott,* 490 U.S. at 417, 109 S.Ct. 1874; thus, we must look to Johnson's right to be free from state-sponsored racial discrimination at a macro level, and not just the alleged violation, to determine whether alternatives open to the inmate exist. *Cf. id.* For example, in *Turner,* the Court viewed the alleged constitutional right at issue as the "freedom of expression" in totality, not the specific right to communicate with inmates at other institutions, although undoubtedly the restriction upon inmates' communication implicated their First Amendment rights. *Turner,* 482 U.S. at 92, 107 S.Ct. 2254. The *Turner* Court held that because inmates had other means of expression available the inmates had alternatives to exercise their freedom of expression, even though their ability to communicate with inmates at other institutions was completely proscribed. *Id.* Likewise, in *O'Lone,* the Court held that inmates had reasonable alternatives to exercise their religious freedom by attending other Muslim ceremonies, even though they were prohibited

---

**12.** In the past, we have noted the connection between prison gangs and racial violence. *See, e.g., Stefanow v. McFadden,* 103 F.3d 1466, 1472 (9th Cir.1996) ("Anyone familiar with prisons understands the seriousness of the problems caused by prison gangs that are fueled by actively virulent racism and religious bigotry.").

from participating in the Jumu'ah religious ceremony in particular. 482 U.S. at 351, 107 S.Ct. 2400; *see also Friedman v. State of Arizona,* 912 F.2d 328, 332 (9th Cir. 1990) (holding that inmates were not "denied 'all means of expression' of their religion" due to their ability to "participate in other aspects of their religion"). Accordingly, the correct analysis in this case is not whether the state has provided reasonable alternatives from the CDC's use of race as a factor for the first 60 days, but whether the state has provided reasonable alternatives from racial discrimination in general.

We conclude it has. The policy in question lasts only 60 days—after which discrimination is no longer alleged—and there are no "black" cells or "white" cells. Moreover, the remainder of the prison is integrated in full without regard to race. There is no distinction based on race as to jobs, meals, yard and recreation time, and vocational and educational assignments. Just as the inmates in *Turner* and *O'Lone* had reasonable alternatives to exercise their constitutional rights, so too does Johnson.[13]

### C

The third *Turner* factor requires us to examine what impact accommodating the inmate's asserted right will have on prison personnel, inmates, and the allocation of prison resources. *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. The CDC administrators contend that failing to consider race in making initial housing assignments would lead to increased racial violence both in the cells and in the common areas. The im-

pact would be significant, jeopardizing the safety of all the inmates and prison staff.

Johnson, however, contends that the administrators failed to proffer evidence that not using race as a factor would cause a strain on prison resources. Again, Johnson misconstrues *Turner.* The CDC does not have to prove that eliminating their policy would impact (1) prison personnel, (2) inmates, and (3) prison resources; rather, Johnson must prove that eliminating the CDC's housing policy would not affect one of these areas in a sufficient manner. *See Harper,* 494 U.S. at 227, 110 S.Ct. 1028. Johnson has failed to do so.

To begin with, Johnson did not rebut the CDC's claim that racial violence would occur both in cells and in the recreation areas if the CDC did not take race into account. *See Frost,* 197 F.3d at 358 (noting that Plaintiff's failure to bear his burden on *Turner's* first prong is relevant under the third prong as well). The administrators, moreover, affirmatively proffered evidence to show that inmate and guard safety would be compromised. The CDC administrators uniformly stated that failing to take race into account when making an initial housing decision would be dangerous to staff and inmates alike. Steven Cambra, the current CDC Director, in his declaration stated,

> If race were to be disregarded entirely ... I am certain, based upon my experience with CDC prisoners, that there will be problems within the individual cells. These will be problems that the staff will have a difficult time controlling. I believe there will be fights in the cells and the problems will emanate onto the pris-

---

13. Even if the alleged constitutional right, however, were viewed more narrowly and limited only to alternatives within the 60–day period, our ultimate conclusion would not be altered. *See Casey,* 4 F.3d at 1522 (refusing to remand to determine whether inmates had

a reasonable alternative to the right at issue "because resolution of this factor in favor of the inmates would not alter our ultimate legal conclusion—that the *Turner* test of reasonableness is satisfied").

on yards. With respect to inside individual cells, I do not feel that prison housing staff are adequately able to deal with the problems that could arise.... I feel that because there are limited staff to oversee numerous cells, it would be very difficult to assist inmates if the staff were needed in several places at one time.

Declaration of Steven Cambra, Acting Director of Corrections, in Support of Defendants' Motion for Summary Judgment, at 3 (April 9, 2001); *see also* Deposition of Linda L. Schulteis, Associate Warden at California State Prison–Lancaster, at 32 (Dec. 6, 2000) ("You cannot house a Japanese inmate with a Chinese inmate. You cannot. They will kill each other. They won't even tell you about it. They will just do it.").

The Court found similar testimony persuasive in *Turner.* In *Turner,* the Court stated, "Prison officials have stated that in their expert opinion, correspondence between prison institutions facilitates the development of informal organizations that threaten the core functions of prison administration, maintaining safety and internal security." *Turner,* 482 U.S. at 92, 107 S.Ct. 2254. As a result, the Court held that the asserted right could "be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike." *Id.*

Furthermore, prohibiting race to factor into the officials' decisionmaking process would have a "ripple effect" of not only increasing the level of violence within the cells, but in the common areas as well. *See, e.g., White,* 832 F.Supp. at 1130 (racially integrated double-celling attributed to a racial riot in which ten people were murdered); Steven Cambra, Acting Director of Corrections, in Support of Defendants' Motion for Summary Judgment, *supra,* at 3; *cf. Turner,* 482 U.S. at 92, 107

S.Ct. 2254; *Frost,* 197 F.3d at 358. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. Accommodating the inmates' rights, thus, would be dangerous to staff and inmates in the views of the CDC. Without contrary evidence that the accommodation of the inmates' rights would not affect inmate and staff safety, we must defer to the judgment of the administrators.

### D

The fourth factor we must examine is whether reasonable alternatives to using race as a factor in the initial housing policy would "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests...." *Turner,* 482 U.S. at 91, 107 S.Ct. 2254. This is not a "least restrictive alternative test"; it is a reasonableness test. Thus, while the regulation need not be a perfect fit to the solution at hand, it cannot be an "exaggerated response." *Id.* at 90, 107 S.Ct. 2254. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* "The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." *Mauro,* 188 F.3d at 1062.

Johnson argues that officials could screen inmates (1) on the basis of professed gang affiliation or (2) by examining the inmates' racial animus or a history of interracial violence, but he again has proffered no evidence in support of his position. Johnson's first proposed solution—

that the prison officials could ask inmates about their gang affiliation or racial biases—is disingenuous. There is little chance that inmates will be forthcoming about their past violent episodes or criminal gang activity so as to provide an accurate and dependable picture of the inmate. *See* Deposition of Linda L. Schulteis, Associate Warden at California State Prison–Lancaster, *supra,* at 24 (noting that Northern Hispanic inmates cannot come to a Southern institution without being in danger, but that they will not inform the staff), 32–33 (noting that Japanese and Chinese prisoners will not tell officials of their animosity toward one another). Certainly, if this information was offered by the inmate or if the CDC knew of the inmate's past violence against an ethnic group, the CDC should take it into account, and perhaps even has a duty to consider it when making its housing assignment. *See Harper,* 494 U.S. at 223, 110 S.Ct. 1028 ("Prison administrators have not only an interest in ensuring the safety of prison staffs and administrative personnel, but also the duty to take reasonable measures for the prisoners' own safety." (internal citation omitted)); *Robinson v. Prunty,* 249 F.3d 862, 866 (9th Cir.2001). Requesting that inmates provide potentially self-incriminating information themselves, however, does not provide sufficiently reliable data under which the CDC could make a meaningful decision. Without a guarantee of the veracity of the information, Johnson's argument does not provide a reasonable alternative.

Johnson also has not shown that an examination of an inmate's past is reasonable. Even if a background check would provide accurate information regarding an inmate's propensity for racial violence outside prison, it is unclear whether that information would provide a true picture of an inmate's propensity for racial violence in prison; the inmate's attitude outside of

prison regarding race may change once incarcerated. The same holds true for transferred inmates as well. The racial make-up or individual inmates of the new prison may cause a previously benign inmate to become potentially dangerous. The CDC cannot accurately gauge an inmate's propensity for racial violence without first observing him in this new environment.

Johnson also never answered how the CDC could accumulate the relevant information needed to make an informed housing decision. As discussed above, inmates are unlikely to be forthcoming regarding their potentially incriminating history of violence, and, thus, the CDC would have to conduct its own independent examination. There is no indication that an independent examination would not be more than a de minimis cost. Without some sort of showing that the CDC could accomplish its goals without incurring a significant cost, Johnson cannot prevail. *Mauro,* 188 F.3d at 1062.

Our decision that the CDC policy is not an "exaggerated response" is reinforced when we look to our Eighth Amendment Cruel and Unusual Punishment Clause jurisprudence. Prison authorities are required under the Eighth Amendment to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal citations and quotations omitted); *Harper,* 494 U.S. at 223, 110 S.Ct. 1028. *See generally Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (applying the Eighth Amendment's Cruel and Unusual Punishment Clause to the states via the Fourteenth Amendment). In *Robinson v. Prunty,* 249 F.3d 862, 866 (9th Cir.2001), we held that it was clearly established that such reasonable measures included taking an inmate's race into ac-

count when allowing inmates to enter the recreation yards. The court, in denying the prison administrators qualified immunity, held that the inmate's "evidence paints a gladiator-like scenario, in which prison guards are aware that placing inmates of different races in the yard at the same time presents a serious risk of violent outbreaks." 249 F.3d at 868. According to the court, the administrators were not entitled to qualified immunity because the law clearly established that their actions were unlawful. *Id.*

Similarly, the failure to take race into consideration in cell assignments could be considered "deliberate indifference" to prisoners' safety and could itself constitute a constitutional violation. Steven Cambra, the Acting Director of the CDC, noted the risk of personal liability if race were not considered in making housing decisions: "[I]f I just take two inmates and have total disregard for their ethnicity ... I feel I am putting myself in a position that I could be charged with setting up one of them to be injured." Declaration of Steven Cambra, Acting Director of Corrections, in Support of Defendants' Motion for Summary Judgment, *supra,* at 3. To reduce its liability under the Eighth Amendment and to protect inmates, the CDC crafted a policy, assigning cell mates largely along racial lines for a limited time, so as to decrease the risk of racial violence that the administrators are aware exists. Certainly, this is a reasonable response in light of the conflicting responsibilities that the CDC must balance.

## V

Although there may be many ways in which to achieve the state's objective in reducing racial violence in the CDC, the path chosen by the State of California is reasonably related to the administrators' concern for racial violence and thus must be upheld. If this policy were implemented beyond the prison walls, undoubtedly, we would strike it down as unconstitutional. The prison system, however, is inherently different and we must defer our judgment to that of the prison administrators until presented evidence demonstrating the unreasonableness of the administrators' policy. The Supreme Court has instructed us that inmates bear a "heavy burden" to show that prison officials acted unconstitutionally, and in this case, Johnson failed to carry his burden. He presented little to no evidence and could not rebut the presumption of constitutionality that the administrators are afforded.

Because Johnson failed to prove that a constitutional violation could be made out, we need not reach the ultimate question of whether the CDC administrators are entitled to qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

AFFIRMED.