Jamel **WALKER**, Plaintiff–Appellant,

v.

James H. **GOMEZ**; Kingston W. Prunty; R.R. Rath, Correctional Sergeant, Defendants–Appellees.

No. 99–55265.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 2003.

Filed June 7, 2004.

K. Jamel Walker, plaintiff-appellant in propria persona, Calipatria, CA; and Brett J. Williamson, Amy J. Laurendeau, and Christine E. Cwiertny, pro bono attorneys, O'Melveny & Myers LLP, Newport Beach, CA; for the plaintiff-appellant.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, David P. Druliner, Assistant Attorney General, Paul D. Gifford, Senior Assistant Attorney General, Allen Crown, Acting Senior Assistant Attorney General, Darrell Lepkowsky, Supervising Deputy Attorney General, and Robert F. Helfand, Deputy Attorney General, Los Angeles, CA, for the defendants-appellees.

Before: KOZINSKI, FERNANDEZ and RYMER, Circuit Judges.

KOZINSKI, Circuit Judge:

Plaintiff, a black California inmate, brings suit under 42 U.S.C. § 1983, claiming he was denied equal protection because, during three prison lockdowns, he was not allowed to resume his prison job until after similarly-situated inmates of other races.

## Facts

K. Jamel Walker is serving a life sentence in the custody of the California Department of Corrections, in Calipatria State Prison. The prison is made up of four separate facilities or yards—A, B, C and D; Walker is housed in Facility A. In April 1994, Walker was assigned to be a clerk in the Facility A Law Library. He was initially paid at an hourly rate of nineteen cents; he now earns the maximum rate of thirty-two cents and is Lead Law Library Clerk. Walker asserts that he is not and never has been a gang member.

Calipatria State Prison has a history of significant racial tension and violence. On May 2, 1994, for example, several Hispanic and black inmates were involved in a fight, as a result of which the prison was placed on lockdown. As part of the lockdown, all prisoners were restricted to their cells and not permitted to exercise. However, only Hispanic and black inmates were also excluded from the critical-workers list—a category of workers approved to continue attending their job assignments despite the lockdown. Walker was not permitted to return to his library assignment until June 1, 1994—three weeks, he alleges, after a white inmate who served as Assistant Clerk had been allowed back to work. Similar incidents of violence between Hispanic and black prisoners took place on November 28, 1994, and December 9, 1994.

At issue here are the lockdown procedures that followed three separate incidents in 1995.[1] Unlike the inmate-on-inmate violence that occurred in 1994, these instances involved inmate attacks on staff. On May 5, 1995, five black prisoners attacked staff members in Facility A; eight staff were injured as a result. All five assailants were members of the East Coast Crips, a predominantly black gang. All activities except family visits were immediately terminated pending investigation of the incident. The preliminary investigation that day revealed that the attack was in retaliation for the subduing of an inmate on May 4. As part of the complete investigation, all Facility A inmates were interviewed starting on May 8. On May 10, Warden Prunty requested authorization for a state of emergency. On May 11, Prunty allowed limited groups of critical workers—identified as "clerks"—to be released to their jobs and, on May 13, expanded the critical-workers list to include "[i]n-grounds work crews, central kitchen, PIA laundry, yard crews, visiting porters, and canteen clerks." Synopsis of State of Emergency, Exh. 4 to Defendants' Motion for Summary Judgment, at 2 [hereinafter Report]. Black inmates were not eligible to be critical workers.

The critical-workers list was further expanded on May 15 to allow more inmates to attend previously-identified assignments. As of May 15, prison officials had discovered no further significant information to add to the preliminary investigation, and it had "become apparent that the May 5th incident was an isolated incident in that a majority of the Facility 'A' inmate population was not aware of the planned attack." *Id.* at 3. That day, inmates identified as associates of the East Coast Crips were transferred out of the prison.[2] On

---

**1.** The dissent assumes that the violent incidents in 1994, as well as those in 1995, are at issue. *See* Dissent at 980. To the contrary, Walker made clear in his opposition to summary judgment and in briefing on appeal that he challenges only the lockdown procedures that followed the 1995 incidents.

**2.** The evidence conflicts as to whether the conclusion that the East Coast Crips were responsible for the incident was reached, and

May 18, Walker was escorted to his job assignment at the library. He alleges that he was told soon after his arrival that blacks were still not eligible to be critical workers, though they could use the law library if they had verified court deadlines. Despite this, Walker says, he was permitted to perform his duties because the library lacked other clerks with adequate skills.[3] On May 19, additional Facility A critical workers were released, but "[n]o Black inmates . . . [were] utilized as 'critical workers.' " *Id.* On May 22, black inmates were added to the critical-workers list.

The second incident took place on June 18, 1995, in Facility B. Three black inmates attacked staff members in front of the dining room, as a result of which three staff were injured. The entire prison, including Facility A, was put on lockdown. Two of the assailants were East Coast Crips and the third a member of another black gang, the Rolling 40's Crips. On June 19, Warden Prunty ordered that all black inmates' central files be reviewed in order to identify members and affiliates of the East Coast Crips, and additionally ordered that the prison be searched for weapons. Black workers could be authorized for eligibility for the critical-workers list only after central file review.

Walker alleges he was added to the critical-workers list on June 21 and that he was, at the time, the only black worker on the list. That same day, thirty-six prisoners affiliated with the East Coast Crips were transferred out of the prison. Walker began work the next day when the library reopened. On June 23, a "comprehensive list of critical workers . . . [was] published based on central file screening and need for workers." *Id.* at 8.

The third incident also took place in Facility B. On October 31, 1995, a group of black inmates—Walker alleges they were gang members—stabbed a staff member. The prison was once again placed on lockdown, and black inmates were excluded from the critical-workers list until prison officials completed their investigation. Walker alleges that, although he was allowed to report to work on November 2 and 3, he was forced to return to his cell on November 4, and told that blacks were not eligible to be placed on the critical-workers list. Walker adds that he was not allowed to return to his job for the next week.

Acting pro se, Walker sued defendants under section 1983. He seeks declaratory and injunctive relief and monetary damages.[4] Defendants moved for summary

the inmates associated with the East Coast Crips were transferred out, on May 15 or May 17. In defendants' statement of undisputed facts in support of their summary judgment motion, they assert that this conclusion was reached on May 17, citing Walker's complaint, a declaration by Chief Deputy Warden Silvia H. Garcia, and an undated report entitled "Synopsis of State of Emergency," which was submitted as an exhibit to the summary judgment motion. Defendants do not state there what day the inmates were transferred out. The Report and the complaint give May 15 as the date both occurred, while Garcia's declaration says May 17. This discrepancy is not material to our analysis, and so we leave it unresolved.

3. Defendants appear to misconstrue the record. Citing Walker's complaint, they state that Walker was put on the critical-workers list on May 18. Walker makes no such assertion in his complaint.

4. The relevant defendants for purposes of this issue are K.W. Prunty, the Warden of Calipatria State Prison; Bobby L. Reed, the Chief Deputy Warden; Sylvia Huerta Garcia, an associate warden; A.M. Tutt, an employee and correctional captain/program administrator in Facility A; and G.J. Janda, an employee and a correctional lieutenant. Defendants held these positions at all relevant times.

judgment, which the district court granted. Walker appealed pro se; after an initial round of briefing, we ordered that pro bono counsel be appointed and that the parties file supplemental briefing.

## Discussion

 1. Racial discrimination in prisons and jails is unconstitutional under the Fourteenth Amendment, except for " 'the necessities of prison security and discipline.' " *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam) (quoting *Lee v. Washington*, 390 U.S. 333, 334, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam)). Walker does not dispute the validity of confining all prisoners to their cells as part of a prison-wide lockdown. He claims, instead, that defendants discriminated against him by employing race to determine threshold ineligibility for placement on critical-workers lists during lockdown periods.[5] While the Due Process Clause of the Fourteenth Amendment "does not create a property or liberty interest in prison employment," *Ingram v. Papalia*, 804 F.2d 595, 596 (10th Cir.1986) (per curiam); *see Baumann v. Ariz. Dep't of Corrections*, 754 F.2d 841, 846 (9th Cir.1985), racial discrimination in the assignment of jobs violates equal protection, *Black v. Lane*, 824 F.2d 561, 562 (7th Cir.1987).

 Defendants argued, and the district court agreed, that summary judgment was appropriate because Walker had failed to demonstrate that defendants acted with discriminatory intent. In support of summary judgment, defendants submitted several incident and investigation reports, including an undated, thirty-eight-page report entitled "Synopsis of State of Emergency" covering the period from May 5, 1995, to September 12, 1995, and a

declaration by Sylvia H. Garcia, as Chief Deputy Warden at Calipatria State Prison. In opposition, Walker submitted his own declaration.

It is clear from the evidence submitted by defendants in support of summary judgment that they explicitly considered race in determining threshold ineligibility for critical-worker status. Garcia declares under penalty of perjury that, during the lockdown period following the May 5, 1995, incident, "Non African–American inmate workers, whose job assignments were deemed critical, were allowed to report to their job assignments." Decl. of Silvia H. Garcia at 5, ¶ 20 (emphasis added). Similarly, the Report notes that on May 19, "No Black inmates are utilized as 'critical workers,' " Report at 3, and that "Black inmates are added to the 'critical workers' list" on May 22, *id.* at 4. As to the June 18 incident, Garcia states, "African–American critical workers may be considered after the central file review." Decl. of Silvia H. Garcia at 6, ¶ 24. The Report confirms that black inmates could become eligible for critical-worker status only after their files were screened. *See* Report at 8. And, as to the October 31 incident, Garcia states, "A limited number of 'critical workers' were allowed to report to their work assignments which did not include African–American inmates." Decl. of Silvia H. Garcia at 6, ¶ 28.

In *Johnson v. California*, 321 F.3d 791 (9th Cir.2003), *cert. granted,* —— U.S. ——, 124 S.Ct. 1505, 158 L.Ed.2d 151 (2004), we confronted plaintiff's similar claim that "use of race [by the California Department of Corrections] in making initial housing assignments constitute[d] an impermissible racial classification afoul of the Equal Protection Clause." *Id.* at 796. The CDC

---

**5.** Walker raises numerous other issues in this appeal. We address these separately in a

memorandum disposition filed concurrently with this opinion.

employed race as a factor in its housing policy in order to reduce race-based conflict and violence among inmates. *Id.* at 794. The CDC also considered, among other things, "gender, age, classification score, case concerns, custody concerns, mental and physical health, enemy situations, gang affiliation, background, history, [and] custody designation." *Id.* Plaintiff was not required to prove discriminatory intent because "[t]he state admit[ted] considering race when it assign[ed] inmates their cell mate." *Id.* at 796 n. 4 (citing *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 289 n. 27, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Hunter v. Erickson,* 393 U.S. 385, 389, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Loving v. Virginia,* 388 U.S. 1, 8–9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)). "Thus, the policy ... [was] suspect on its face, and ... [plaintiff did not need to] prove a discriminatory intent or impact." *Id.*

Defendants here admit that they used race as the only factor in preliminarily excluding black inmates from critical-workers lists. Walker was therefore not required to prove discriminatory intent. As in *Johnson,* the fact that defendants employed racial classifications for the alleged purpose of promoting safety and order does not alter this conclusion.

Because the district court granted the summary judgment motion before our ruling in *Johnson,* it did not have the benefit of *Johnson's* teachings. *Johnson* nevertheless is binding on us, and so we must reverse the district court's grant of summary judgment on this issue. *See Swift v. Lewis,* 901 F.2d 730, 731 (9th Cir.1990) (summary judgment reversible for legal error).

2. Defendants also assert that they are entitled to qualified immunity.[6] Under *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), we undertake a two-step inquiry in determining whether qualified immunity applies. We first ask whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201, 121 S.Ct. 2151. This prong of the *Saucier* inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee,* 290 F.3d 965, 969 (9th Cir.2002). "If no constitutional right would have been violated were the allegations established," we go no further. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. But if there appears to have been a constitutional violation, we must then ask whether the right in question was "clearly established ... in light of the specific context of the case, not as a broad general proposition." *Id.*

a. As discussed, it is clear that the protections of the Fourteenth Amendment extend to state prisons. *See Lee,* 390 U.S. at 334, 88 S.Ct. 994. In the prison context, however, even fundamental rights such as the right to equal protection are judged by a standard of reasonableness—specifically, whether the actions of prison officials are "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also Jordan v. Gardner,* 986 F.2d 1521, 1530 (9th Cir. 1993) (equal protection concerns fall under *Turner*). Under *Turner,* we first ask whether a "valid rational connection" exists between defendants' actions "and the legitimate governmental interest put forward to justify" them. 482 U.S. at 89, 107 S.Ct. 2254. We next inquire whether there are alternative means for the inmate

---

6. Defendants argued this below in support of summary judgment, but the district court apparently found it unnecessary to rule on the issue.

to exercise his right, what impact accommodation of the prisoner's right would have on other inmates, guards and prison resources, and whether "obvious, easy alternatives" exist that demonstrate that defendants' actions were an "exaggerated response." *Id.* at 90–91.

The first factor—whether a valid rational connection exists between defendants' actions and a legitimate penological interest—is the *sine qua non* of the *Turner* inquiry. *Shaw v. Murphy*, 532 U.S. 223, 229–30, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001); *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir.2001); *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir.1990). Defendants assert that the penological interest at stake here is the need "to investigate all issues pertaining to a serious incident, allow for a weapons search, and to permit a cool down period for inmates in what is a highly charged situation." Appellee's Supp. Br. at 20. They add: "Because inmates group themselves by ethnicity, a lockdown permits the institution to defuse the situation, identify those ethnic members who were involved plus allow the uninvolved inmates of the ethnic group to be protected." *Id.* What defendants assert, then, is that the lockdown procedures promote safety and order within the prison and facilitate investigation. No doubt, these are legitimate objectives. *See Johnson*, 321 F.3d at 799; *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir.1999) (en banc). The question remains whether the specific action at issue—race-based exclusion of inmates from critical-workers lists—is rationally related to these objectives.

■ The asserted relationship seems to be a matter of common sense: Where apparently race-related violence requires a prison-wide lockdown, inmates who are members of those races involved in the violence should be precluded from performing even critical functions until adequate investigation clears them, lest they inflict further violence—or themselves become victims of violence. Where the connection between a legitimate objective and a prison practice seems to be a matter of common sense, an inmate bears the burden of refuting the connection. In *Walker v. Sumner*, for example, plaintiff alleged that there was no rational connection between defendants' practice of taking prisoner blood and screening for AIDS, because "the prison officials knew that no prisoner had AIDS at the time the disputed samples were taken." *Walker*, 917 F.2d at 384. "Defendants d[id] not contest" this allegation, so the common-sense connection between the policy and the legitimate penological objective was adequately refuted. *Id.*[7]

In attempting to break the common-sense connection here, Walker first points out that, while prison-gang affiliation is

---

7. *Walker* illustrates that a plaintiff's burden in severing the asserted common-sense connection between a policy and an asserted objective is a light one. Plaintiff in *Walker* had had no success in his discovery efforts, *Walker*, 917 F.2d at 384 & n. 2, and thus all he could present to refute defendants' asserted connection were uncontested allegations, *see id.* at 384. These uncontested assertions nevertheless "sufficed to refute the otherwise obvious connection between taking blood samples from prisoners and preserving the health, welfare, and safety of prisoners by diagnosing those who were HIV positive." *Frost v. Symington*, 197 F.3d 348, 356 (9th Cir.1999) (discussing *Walker*). It was therefore incumbent upon defendants to "present enough counterevidence to show that the connection [wa]s not so 'remote as to render the policy arbitrary or irrational.' " *Id.* at 357 (quoting *Mauro*, 188 F.3d at 1060). If, on the other hand, an inmate does not sufficiently "refute a common-sense connection" between the measures taken and a legitimate penological objective, defendants prevail as to that factor without producing any evidence. *Id.*

often based on race, this does not mean that all members of a race will be affiliated with a gang predominantly comprised of members of that race. In other words, being black does not necessarily mean you are a member of a black gang. Thus, Walker concludes, making all blacks ineligible for critical-worker status was not a rational response to the May 5, June 18 and October 31 incidents, the first two of which were found to be gang-related and the last of which Walker asserts was also gang-related. Walker's press on the issue of whether the violent incidents were gang-or race-based gains him little ground. Garcia's declaration indicates that the gang deemed primarily responsible for the May 5 and June 18 incidents, the East Coast Crips, is largely comprised of blacks. Walker does not dispute this. Moreover, we have recognized the common-sense link between gangs and racial violence in the prison context. *Johnson,* 321 F.3d at 803 & n. 12. Thus, it follows that prison authorities investigating gang-related violence and attempting to restore safety and order might rationally take race into account in implementing lockdown procedures.

Walker also asserts in his declaration that, during the lockdown period following the May 5 incident, defendants continued to allow black inmates with court deadlines to make use of the law library while being supervised only by Acting Law Library Supervisor Christine Harris. Harris is a vocational instructor, not a correctional officer. Walker adds that black inmates also made use of the library during the lockdown period following the June 18 incident, though he does not describe the conditions of supervision. Defendants do not dispute these allegations in their reply to Walker's opposition to summary judgment or in their briefing before us.

With respect to the May 5 incident, Walker's uncontested allegation that black inmates were permitted to use the law library supervised only by a vocational officer calls into question whether the prison's security concerns were really so acute that it was rational to treat blacks as automatically ineligible for critical-worker status.[8] We cannot say the same of the June 18 incident, since Walker does not describe the conditions of supervision in the law library for the period following the lockdown. However, we do not evaluate defendants' actions collectively, but rather on an incident-by-incident basis. Their actions may well have been rationally related to legitimate objectives during one lockdown period, but not another.

Walker also alleges that his file was screened after the May 5 incident in order to permit him to act as a critical worker, thus calling into question why he needed to be re-screened in order to be eligible as a critical worker for the June 18 lockdown period. At the very least, by the October 31 lockdown, Walker's file had been screened twice—after the May 5 incident, and again after the June 18 incident pursuant to a central-file review—thus raising the question why, at that point, he could not be made eligible for critical-worker status. This question seems all the more nagging because Walker notes that the June 18 and October 31 incidents occurred in Facility B, not Facility A where he is housed.

---

**8.** The dissent suggests that "officials could well conclude that supervising an inmate who is using the library is easier than supervising an inmate who is working in the library." Dissent at 981. That could be, but once Walker called the rationality of defendants' actions into question, it was incumbent on defendants to say as much and rebut Walker's position with evidence. *See* note 7 *supra.*

In *Johnson,* we held that race-based screening and segregation in housing could be rationally related to the objective of ensuring safety and order, *id.* at 803, but we so held only as to screening and racial differentiation that was clearly temporary in nature. The initial housing assignments prisoners received, based in part on their race, were for a period of sixty days only, at which point prisoners were given a permanent housing assignment or transferred to another institution. *Id.* at 794–95. We held this procedure permissible under *Turner* because screening the file of, and assessing the safety risks presented by, each individual inmate upon his arrival at the prison could be rationally related to preventing race-based violence in their cells, where inmates are particularly susceptible to attack. *Id.* at 794, 802–03. Our holding was thus confined to a one-time measure of limited duration. By contrast, the record here indicates that lockdowns occur fairly frequently and thus, by implication, critical-workers lists are employed with similar frequency. Moreover, there appear to be no limits on the duration of lockdowns, or the periods for which inmates may be excluded from critical-workers lists.[9]

Viewing the record in the light most favorable to Walker, as we must, we conclude that he cast sufficient doubt on the common-sense connection between defendants' asserted objectives and their actions to require defendants to come forward with rebuttal evidence. Defendants have not presented evidence demonstrating the specific connection between race-based exclusion from critical-workers lists and promoting safety, order and investigation.

Instead, they merely re-invoke the same objectives. This is insufficient to rebut Walker's position. If defendants had come forward with further evidence demonstrating why it was rational to exclude blacks from critical-workers lists while allowing them to use the law library under low-level supervision, or why repeated screenings were a rational prerequisite for eligibility for critical-worker status, in contrast to the one-time screening used as part of the CDC's housing policy in *Johnson,* we might have been required to defer to their judgment. They have not done so, however, and we are therefore required to conclude that Walker's uncontested allegations refute the required rational connection.

Because the essential connection of *Turner's* first factor is not sufficiently borne out as to the May 5, June 18 and October 31 lockdowns, we do not proceed to the remaining *Turner* factors. *Walker,* 917 F.2d at 385. Viewing the record in Walker's favor, the facts alleged show that defendants may have violated his constitutional right to equal protection. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Thus, we must consider whether Walker's right to be free from race-based discrimination as to critical-worker status is one that "was clearly established, and, if so, whether a reasonable prison official would have believed his conduct was clearly unlawful." *Vance v. Barrett,* 345 F.3d 1083, 1088 (9th Cir.2003).

■ **b.** Walker has not brought to our attention, and our independent research does not reveal, case law involving the particular circumstances presented by this

---

**9.** The dissent characterizes defendants' actions as a "temporary fix." Dissent at 982. This disregards the regularity with which lockdowns occur, and the fact that they are of potentially illimitable duration. *See* Michael Wayne Hunter & Bradford J. Frederick,

*Board Up,* BIGnews (Oct.2003), *at* http://www.mainchance.org/bignews/read/october 2003/hunter.html; Michael Wayne Hunter, Condemned to Life, BIGnews (June 2003), *at* http://www.mainchance.org/bignews/read/june2003/hunter.html.

case. The second prong of the *Saucier* inquiry operates at a high level of specificity. It is insufficient that the broad principle underlying a right is well-established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. While it is well-established that racial discrimination in the assignment of prison jobs is unconstitutional, *cf. Black,* 824 F.2d at 562; *Foster v. Wyrick,* 823 F.2d 218, 220 (8th Cir.1987), it has not been clearly established that such race-based differentiation is unconstitutional in the context of a prison-wide lockdown instituted in response to gang-or race-based violence. Defendants are therefore entitled to qualified immunity.

█ We note, however, that this means only that defendants "need not respond in damages. It does not mean that they cannot be enjoined from future violations of ... [Walker's] rights." *Nelson v. Heiss,* 271 F.3d 891, 897 (9th Cir.2001); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Vance, 345 F.3d at 1091 n. 10 (citing *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 527 (9th Cir. 1989)). Nor, of course, does qualified immunity preclude declaratory relief. *Presbyterian Church (U.S.A.),* 870 F.2d at 527.

\* \* \*

We reverse and remand for proceedings consistent with this opinion. The handling of Walker's equal protection claim "will undoubtedly proceed more efficiently and effectively if ... [Walker] has legal representation." *Johnson v. California,* 207 F.3d 650, 656 (9th Cir.2000). We therefore direct the district court to continue pro bono counsel's appointment on remand, unless Walker files a written objection by a deadline to be set by the district court.

**AFFIRMED in part, REVERSED in part and REMANDED.**

FERNANDEZ, Circuit Judge, concurring. .

I concur in Judge Kozinski's opinion, with one exception. I do not join in part 2 of the Discussion.

Although I find that part of the Discussion very informative, in my opinion we should not decide qualified immunity issues in the first instance, but should leave them for the district court. *See Harlow v. Fitzgerald,* 457 U.S. 800, 819–20, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982); *Price v. Hawaii,* 939 F.2d 702, 707 (9th Cir.1991). I realize that we have, on occasion, succumbed to the temptation to swoop down from our coign of vantage and pluck qualified immunity issues from the district court battlefield, but in the long run I think we are better advised to resist that temptation. I, for one, do not think we should attempt to predict the nature or result of further proceedings in the district court, once it actually begins to vet the qualified immunity issues raised here.

Thus, I respectfully concur, but with the exception just noted.

RYMER, J. dissenting.

I part company with the majority's conclusion that Calipatria State Prison's (CSP) critical worker listings ran afoul of Walker's rights to equal protection. We measure an equal protection challenge as we would any other constitutional challenge in the prison environment under *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).[1] Applying the

1. *Turner* instructs courts to consider (1) whether there is a "valid, rational connection

*Turner* factors leads me to conclude that the critical worker listings comport with constitutional requirements, even though they were race-based, because the listings were a rational, temporary response by an otherwise fully integrated prison to a series of extremely violent, race-based incidents. Accordingly, I would affirm.

There is no question that equal protection does not stop at the prison gate. *See Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). However, unlike normal equal protection analysis, prison policies are not subject to strict scrutiny and no compelling government interest need be shown. "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. Instead, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 85, 107 S.Ct. 2254.

Under *Turner,* rather than the administrators bearing the burden of proving their policy constitutional, the inmate bears the burden of proving that prison officials acted outside their broad discretion. *See Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003); *Shaw v. Murphy,* 532 U.S. 223, 232, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001). Walker has not done this.

There is no dispute that CSP was plagued with a number of violent incidents over a period of several months. They started on May 2, 1994, with a fight between Hispanic and African–American inmates. To ensure safety of inmates and staff, all inmates were confined to their cells except for those whose work assignments were considered critical. Hispanic and African–American inmates were not included on the critical workers' list to prevent weapons from being passed between members of either side, to prevent the making of plans to continue the fighting, and to calm things down. A full investigation was conducted that included a search of all facilities and surrounding areas for inmate-manufactured weapons. Walker was not on the critical workers list but was allowed to return to work at the Facility "A" law library on June 1, 1994.

On November 28 a group of African–American inmates attacked eleven Hispanic inmates in the Facility "D" yard. Six Hispanic inmates received stab wounds or lacerations. The inmates continued to fight after prison officials ordered them to stop and fired three warning shots. Six more warning shots were fired to quell the disturbance. As a result of this incident, the warden ordered a lockdown of all inmates, declared a state of emergency that included a prison-wide search for weapons, and developed another critical workers' list that excluded African–American and Hispanic inmates. On December 9, 1994, while the lockdown was still in effect, an Hispanic inmate (who was on his way to shower) stabbed an African–American inmate (who was using the telephone). The

between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right that remain open to the prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and inmates, and on the allocation of prison resources generally;" and (4) "the absence of ready alternatives" which is evidence of the reasonableness of a prison regulation. 482 U.S. at 89–90, 107 S.Ct. 2254.

state of emergency was terminated December 15.

A staff member was assaulted on May 4 by an African–American inmate and on May 5, 1995, five African–American inmates attacked staff members in the Facility "A" program office with inmate-manufactured weapons. Four staff members received multiple stab wounds and four others sustained injuries. Pending an investigation, Warden Prunty suspended all activities except family visits, ordered a search of the prison for weapons, and allowed only critical workers who were not African–American to report to their jobs. The investigation revealed that the May 5 attack was instigated by the "East Coast Crips," an African–American prison gang. Walker was added to the critical workers' list on May 18, 1995 and returned to work at the law library.

On June 18, 1995, two African–American members of the East Coast Crips stabbed two staff members in the Facility "B" dining hall. Warden Prunty ordered another lockdown, a search for weapons in common areas such as the law library, and a review of the central files of all African–American inmates to identify members of the East Coast Crips and their associates. The warden allowed African–American inmates to be placed on the critical workers' list after the central file review. Thirty-six inmates identified with the "East Coast Crips" were transferred to Corcoran State Prison on June 21. Walker was placed on the critical workers' list the same day and reported for work on June 22. The state of emergency ended on September 12.

On October 31, 1995, an African–American inmate stabbed a staff member. Warden Prunty ordered a temporary suspension of all programs for the safety of inmates and staff. A search and investigation were conducted, after which African–Americans who had not been included on the critical workers' list following this incident were permitted to go back to work.

Against this backdrop, which unfortunately is one of racial unrest, it is clear to me that the prison's policy of not considering Walker, as an African–American, as a critical worker is reasonably related to the legitimate penological interests of prison security and safety.

*Valid, rational connection.* Restricting the critical workers' list for the limited period following a disturbance until an investigation could be completed served the prison's interest in maintaining order and assuring safety. This objective was legitimate and neutral, although the decision to keep African–American inmates (and after the first two incidents, Hispanic inmates) off of the list during the lockdown was obviously related to their ethnicity. To this extent it was not neutral and was discriminatory. However, "prison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails." *Lee,* 390 U.S. at 334, 88 S.Ct. 994 (three justice concurrence); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (noting that racial segregation is unconstitutional outside and inside prisons "save for 'the necessities of prison security and discipline' " as *Lee* held).

Walker argues that a triable issue exists because of evidence that the incidents were gang-related and not racially-motivated. The fact remains, however, that the East Coast Crips were an African–American gang, and African–Americans were involved in the violent incidents. It was not irrational (though it may have been unnecessary) to keep all African–American, as well as all other inmates who had non-critical jobs, locked-down until ev-

erything—including gang membership or association—got sorted out. Inmates involved in the incidents had used inmate-manufactured weapons, and common sense suggests that such weapons could be exchanged in common areas such as the law library. So could messages, threats, and the like.

Walker also maintains that it was particularly nonsensical to keep him from his job in light of the fact that African–American prisoners with court deadlines were allowed access to the library. He points out that a single vocation instructor supervised an average of twenty-two African–American library users per day without incident. However, this makes the officials' decision no less rational. Inmates using the library may have been there one at a time. In any event, allowing inmates to use the law library even during an emergency serves the important function of maintaining their access to the courts, a function not served by allowing Walker to work in the library. Further, officials could well conclude that supervising an inmate who is using the library is easier than supervising an inmate who is working in the library, because an inmate-librarian may have more freedom of movement and interaction with prisoners using the library and, therefore, may pose an increased risk of passing weapons or messages.

*Alternative means to assert the right.* Walker could not pursue any job opportunity during the lockdown without being on the critical workers' list, but he had no right to work or to work in the library to begin with. The question is not whether the prison provided reasonable alternatives from using race as a factor for the critical workers' list, but whether it provid-

ed reasonable alternatives from racial discrimination in general. The work restrictions were temporary in nature and only in place for a limited period of time when imposed. Each critical workers' list directly followed a serious racial incident. Nothing about the character or duration of the restriction suggests that prison officials overreacted to the violence with which they, and all inmates, were confronted. Walker was able to return to his job once the government's interest in safety and security was satisfied. In these circumstances, even assuming that disparate treatment impermissibly occurred in the critical workers' listing, none occurred with respect to Walker's primary right—to be housed at a fully integrated facility.

*Impact on guards, inmates and prison resources.* There is no dispute that continued, or renewed, violence posed a significant risk to the safety of inmates and staff. Walker made no showing otherwise. Nor did he show that eliminating, or changing, the critical workers' policy would have no harmful impact.

*Reasonable alternatives.* Walker suggests that the prison could have used a screening process to identify those African–American inmates who were gang members or associates instead of excluding all African–American inmates from critical job assignments. Perhaps so. However, it is not self-evident that any such screening process would have worked, or would have worked effectively enough, quickly enough, to have done Walker any good.[2] At least Walker makes no such showing. Absent evidence of ready alternatives that would have come at de minimus cost to valid penological interests, I cannot say

---

**2.** Walker was only off work for thirteen days after the May 5 incident, which investigation revealed had been instigated by East Coast Crips, and for three days after the June 18 incident. By June 23, thirty-six East Coast Crips members had been identified and transferred.

that the prison's decision falls short of the reasonable relationship test.

In sum, the administrators' response was not unreasonable. It was a temporary fix that I believe was within the discretion of prison officials to impose given the nature of the incidents that precipitated the emergency situations, and the need to maintain critical operations at the facility. The critical work list was terminated once the facility had been searched, an investigation had been conducted, and order appeared to have been restored. Beyond this, we are not "to second guess the details of prison management." *Bradley v. Hall,* 64 F.3d 1276, 1280 (9th Cir.1995). Accordingly, I conclude that the critical workers' lists, although race-based, were reasonably related to the government's legitimate interest in prison safety. I would therefore affirm on Walker's equal protection claim.